SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

FIRST CITY FINANCIAL CORPORATION, LTD., and Marc Belzberg, Defendants.

Civ. A. No. 86–2240.

United States District Court, District of Columbia.

June 15, 1988.

Barry R. Goldsmith, Leo F. Orenstein, Daniel H. Rubenstein, S.E.C., Div. of Enforcement, Washington, D.C., for S.E.C.

D. Scott Wise, Davis Polk & Wardell, New York City, for First City Financial Corp.

Arthur L. Liman, Max Gitter, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Marc Belzberg.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

The Supreme Court reaffirmed only recently that a fundamental purpose of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78a *et seq.* ("1934 Act" or "Act") was "to protect investors against manipulation of stock prices" and to implement a "philosophy of full disclosure." *Basic Inc., et al. v. Levinson, et al.,* — U.S. ——, 108 S.Ct. 978, 982, 99 L.Ed.2d 194 (1988). In delivering the ruling, Justice Blackmun was addressing problems of false statements and materiality under section 10(b) of the Act. The same underlying principle applies to litigation arising under section 13(d) of the Act which imposes strict disclosure requirements where there are large scale accumulations of equity securities affecting corporate control.

This litigation presents troublesome questions as to whether defendants complied with the disclosure provisions of the 1934 Act, when they arranged to purchase equity shares of Ashland Oil Company ("Ashland"), a Kentucky-based corporation. Ashland is the largest independent refiner in the United States. Acquisition of Ashland shares was part of a carefully orchestrated corporate takeover attempt to evade disclosure by purchasing stock through third party nominee accounts. The Securities and Exchange Commission ("SEC" or "Commission") charged defendants with deliberate efforts to disregard mandatory disclosure requirements of the Act in failing to reveal the extent of their purchases. The takeover bid ultimately failed. Nonetheless, the events triggered an investigation by the SEC which ultimately led to this civil proceeding.

I.

## INTRODUCTION

The Commission complaint alleged that defendants First City Financial Corporation ("First City") and Marc Belzberg, its vice president, engaged in unlawful activities, when they acquired 1.4 million in equity shares of Ashland. Defendants were charged with violating section 13(d) of the 1934 Act, 15 U.S.C. § 78m(d)(1) and the complementing regulations, 17 C.F.R. §§ 240.13d–1 and 13d–3. Section 13(d) of the Act requires public disclosure within 10 days of acquisition of five percent of the beneficial ownership of a publicly traded equity security. Rule 13d–3 defines "beneficial ownership" to include power "to vote or direct the vote" of the relevant shares or "investment power" over the shares.

Defendants purchased by far the bulk of their Ashland shares through Bear Stearns, a leading Wall Street securities brokerage and investment banking firm. While no securities law violations were charged against that firm, its well known chief executive officer, Alan "Ace" Greenberg, worked almost on a daily basis, particularly between March 4th and 17th, 1986, amassing Ashland shares for First City. The Commission's complaint alleged that First City failed to report and to file timely disclosures that it had acquired more than five percent of Ashland stock. The report was filed, but according to the Commission, quite belatedly—on March 26, 1986, well after the required date of March 14. The theory of the Commission complaint was that defendants concealed their real investment intentions in Ashland through a carefully planned and unlawful "parking arrangement." Because of defendants' actions, public investors were not informed of potential changes in corporate control. Defendants were thus able to purchase Ashland shares at prices far below what they would have paid had they made the required disclosure.

Early in the proceedings, defendants' counsel moved for summary judgment, contending that what was involved was no more than "an honest undisputed misunderstanding between [Marc Belzberg] an investor and [Alan Greenberg] his stockbroker." Because the Court found that there were disputed factual matters concerning the existence of an "understanding" particularly regarding the intentions of Marc Belzberg, the defendants' motion for summary judgment was rejected until all facts—contested and uncontested—could be fully presented.

The Court has considered and reviewed the entire record, beginning with the Commission's administrative proceedings, and ending with the trial proceedings. In doing so, the credibility of the parties and their witnesses has been assessed, and reasonable inferences have been drawn from all that has been presented.

For the reasons set forth below the Court finds that defendants acquired Ashland shares for First City without following the proscriptions of the Securities Exchange Act of 1934. The Court also determines that appropriate declaratory and injunctive relief are warranted, and that defendants should be required to disgorge all wrongfully gained profits. The reasons supporting the Court's findings and conclusions are set forth below.

## II

## FINDINGS

### Background

First City, a Canadian corporation, was formed 40 years ago by three wealthy, knowledgeable, and astute businessmen—Samuel, William and Hyman Belzberg. Operating at all times as a tightly controlled and highly successful family business, the three brothers, senior members of the family, own at least 70 percent of the company's stock. First City shares are traded on the Toronto Stock Exchange. An active part of its business involves investing in publicly-traded securities of United States corporations, listed on the national exchanges.

Their Vancouver, British Columbia-based business is a multi-million dollar diversified holding and investment company with valuable investments scattered throughout Canada and parts of the United States. On various occasions, the company has been described in the national press and financial journals as having mounted aggressive, if not always successful, investment and takeover attempts.[1]

Samuel Belzberg is First City's President, Chairman of the Board, and Chief Executive Officer. Even though the brothers are regarded as equals in all business matters, the trial testimony clearly showed

---

1. During 1986, more than 76 news articles discussing the activities of First City and the Belzberg family have appeared in the national press. With few exceptions, all involved the Belzbergs' various corporate takeover attempts; several articles described the family as "active corporate raiders." *See, e.g.,* New York Times, Dec. 23, 1986 at 4 col. 1; New York Times, Dec. 2, 1986, at 10 col. 6; New York Times Nov. 1, 1986, at 38 col. 5.

that Samuel is the patriarch of the family businesses and is, indeed, First City's financial impresario. As described by his counsel, he takes a "hands-on" approach to First City's securities-related activities.

Defendant Marc Belzberg, his son, is vice president of First City. For some time he has directed and conducted various corporate affairs from New York City, working with a First City subsidiary—The First City Capital Corporation ("First City Capital"). He serves as a director of First City Capital. The New York subsidiary evaluates investments in the United States for First City. In testimony before the Commission on May 29, 1986, he described his responsibilities as *"reviewing potential corporate acquisitions* ... stock investments, ... and venture capital investments" as well as placing orders to buy and sell securities for First City. (MB–I at 6.) (emphasis added)[2]

At the time of the SEC investigation, the subsidiary First City Capital, was staffed by a limited and carefully selected group of professional and clerical employees. Several members of that staff played an important role in the events leading to this litigation.

### The Initial Interest in Ashland—Events of February, 1986

The Belzbergs' interest in Ashland was kindled in early 1986 when on February 3, Alan Alan, a New York stockbroker and a recently formed acquaintance, addressed a letter to Samuel Belzberg at his Vancouver, B.C. office. Alan's letter (Px. 37), written with rhetorical flourishes and an excess of optimism, turned Belzberg's attention to a *"sensational investment opportunity* ... Ashland .... an exclusive opportunity [which] I haven't discussed ... with any other investor." (emphasis added.) The letter continued in part:

Nothing is perfect, and Ashland is no exception. But the situation is as near perfect as anything we're likely to see in this environment.

\*　　\*　　\*　　\*　　\*　　\*

In the past 4 or 5 weeks, ASH's stock moved up from the 34–35 area to about 42½ (on January 21st, the stock was 41¾) and then swung back to around 36..... In the past couple of sensational market sessions, the stock has crept back up only a couple of points to around 38.

For ASH, I would like to suggest that the circumstances and timing could hardly be better for the *"Sam Belzberg Effect."* (Emphasis in original).

\*　　\*　　\*　　\*　　\*　　\*

Several days later, Alan addressed a second letter to Samuel Belzberg presenting a critique and an analysis, including his "break-up valuation" of Ashland. At the father's request, copies of the documents and other materials were forwarded to Marc Belzberg at the New York office. Marc immediately directed two financial analysts in the New York office, Gordon Wolf and Jeffrey Perry, "to begin working full-time in analyzing [Ashland], its components and the refining industry." (GW at 91.) The assignment was given a priority rating since Marc anticipated further discussions with his father within several days.

From the outset, Marc and his father regarded Ashland as an attractive investment opportunity. Within several days, and fortified by the preliminary analyses of Wolf and Perry, Marc and his father made a decision to purchase Ashland Oil. Initially, they purchased 61,000 shares through the Goldman Sachs brokerage firm. Beginning with that purchase and continuing through the end of February, the two consulted almost daily about the company. Their interest never waned and as Marc recounted in his initial investigative testimony before the Commission: "our appetite for Ashland stock was ... reviewed constantly throughout this period." (MB–I at 15.) In addition, after daily conversations with Alan, a special Ashland trading account was established with Katz–Goldring, Alan's brokerage firm. By February 28, 1986, First City's total investment had

---

**2.** References to exhibits are cited respectively as Px (plaintiff) and Dx (defendant). References to the trial transcript are cited as Tr. References to investigative testimony before the Commission and pretrial deposition testimony are identified as such and by the initials of the deponent.

increased to 1.3 million shares, just under 4.8 percent of the company's outstanding stock.

In establishing the special trading account, Marc Belzberg instructed Alan to handle the purchases in a "discreet" manner so as to maintain the confidentiality of purchases and to avoid driving up Ashland's price. Accordingly, Alan resorted to a specially designated nominee account, labeled as "Debbs." Confirmations of the transactions under that name, were mailed to Robi Blumenstein's residence to conceal the purchases from any other party. Blumenstein was responsible at First City Capital for compliance with federal securities and antitrust laws.

Not surprisingly, defendants discount any significance to the use of a nominee account. Indeed, Mr. Blumenstein testified that it was routine to use separate "discreet" accounts when accumulating a significant amount of stock so as to prevent leaks and maintain flexibility over which company to place stocks in.[3]

As defendants continued to purchase Ashland, Gordon Wolf spoke frequently with Alan regarding the materials on Ashland which Alan readily supplied. Meanwhile, Marc Belzberg engaged Pace Consultants, a Texas consulting firm with noted experience in oil refining to assess petroleum-related segments of Ashland's business. Thereafter, on February 28, 1986, responding to the "urgency" of the assignment, Pace Consultants submitted initial conclusions which gave favorable valuations of Ashland's related business segments. Several days later, on March 3, Pace submitted further revisions which increased even more its initial valuation of Ashland's assets.

### Belzberg's Decision to Switch Brokers

When First City's holdings approached a critical point with the imminent possibility of exceeding the five percent level, Marc Belzberg, without consulting his father or anyone, made a unilateral decision on February 26, 1986, to engage Alan "Ace" Greenberg at Bear Stearns rather than continue making purchases through Katz-Goldring. That was a significant change and undoubtedly an important decision. While the trial testimony and record showed that Marc frequently discussed and consulted his father on routine matters, he could not recall if he had conferred with him before making this particular decision. (MB-II at 62-63.) Nor did his father ever recall discussing the matter with his son. (SB at 80.)

According to Belzberg, the First City family had a long ongoing and stable relationship with Greenberg. Greenberg conceded as much when he remarked in a pretrial deposition that soon after he met Samuel Belzberg, we "fell in love." The two had great respect for each other's business acumen and skill. Over the years Bear Stearns, through Greenberg, had handled a considerable amount of securities trading for First City as well as other business dealings, including investment banking and public financing.[4]

---

**3.** The Court recognizes defendants' claim for and need to keep their business dealings discreet and from public view. The record indicates that First City routinely used nominee accounts when accumulating a significant amount of stock. Tr. 221, 565-566. But here, the question is whether defendants' use of such accounts facilitated their efforts to circumvent the reporting requirements of the Act.

The undisputed evidence in this proceeding shows that in February 1986, 1.4 million shares or approximately 4.9 percent of Ashland's outstanding shares were held in nominee accounts owned by First City.

**4.** The record indicated that after Alan's brokerage firm was replaced by Bear Stearns he received a personal payment of $100,000 from Marc Belzberg. The payment was in addition to the brokerage commission already earned by Alan. Belzberg testified that the $100,000 was calculated on the commissions Alan would have earned if all subsequent Ashland purchases were made through him rather than Bear Stearns. (MB-II at 43.)

The "modest bonus" was not the end of such payments. Marc Belzberg further testified that the Katz-Goldring firm was a like beneficiary. The payment to the firm was calculated under the same formula. However, because of a memory lapse, Belzberg was unable to recall the precise amount of that particular bonus.

The matter of the two payments was disclosed when SEC counsel interrogated Marc Belzberg in a pretrial deposition. Defendants' counsel did not pursue the matter.

Absent any further explanations on the record, the Court finds that payment of those

The decision to switch brokers clearly demonstrated Belzberg's increasing "appetite" for Ashland and a desire to position First City so as to launch a major takeover effort—which he could do only through facilities afforded by Greenberg and Bear Stearns. This was disclosed at his pretrial deposition of February 5, 1987, many months before trial, when he explained in some detail:

> Bear Stearns, which has capital, was able to buy the stock for its own account and enter into a put/call agreement with us regarding that stock, whereas Alan Alan, whose firm did not have capital, could not have serviced [us] in that fashion.

(MB–II at 44.) However, at the merits trial, he testified that the switch to a new brokerage firm was to avoid alerting the public that an Ashland accumulation was in progress, which in turn would impact on the market price. (Tr. 410–411.)

Belzberg's testimony in this regard was suspect; it neither comported with the factual circumstances surrounding the switch nor with his subsequent conversations with Greenberg concerning Ashland stock. When Belzberg changed brokers, First City was rapidly approaching and was only a fraction below the threshold limit. Certainly, he could have secured the few remaining shares through Alan's brokerage firm without alerting the market of significant accumulations. It is difficult to believe that a concern about the secrecy of First City's equity accumulations would cause him to widen the circle of persons who knew of his interests—unless of course he had an undisclosed compelling reason, namely, to increase holdings in Ashland without complying with the Act. Moreover, the very fact that Belzberg telephoned Greenberg within a week to discuss further investments in Ashland, tends to show that he was strongly contemplating having Greenberg purchase the shares well before mid-March.

With the shift to Bear Stearns, Marc Belzberg placed orders with Ace Greenberg for additional shares. As was true in their transactions with Alan and Katz–Goldring, a portion of these shares was placed in a nominee account, this time "Fox Co." Transaction confirmations were mailed to the home of Ann Nichols, First City's comptroller in New York. After two relatively small transactions, First City's holdings in Ashland increased to 1.4 million. Thus, on February 28, First City was a bare fraction below the five percent filing threshold. At this point Belzberg was quite mindful of the legal consequences as to further purchases.

It was around this time that Pace Consultants rendered its preliminary report, which was very favorable. Several days later, however, on March 3, defendants' interests were further aroused when a Pace representative telecopied further revisions to Gordon Wolf which adjusted still upward its previous valuations. At the same time Marc Belzberg was also conferring with and receiving analyses of Ashland Oil from Phillip Asquith, a Bear Stearns specialist in oil industry investments.

*The March 4th Telephone Call*

Upon receiving the Pace reports, Belzberg and Greenberg engaged in the first of several disputed telephone conversations concerning Ashland; the first call took place on March 4. The subject, purpose and intent of that and other telephone conversations which continued through March 17, are crucial, and in large measure, form the basis for the charge of securities law violations against defendants.

The Commission contends that when Belzberg called Greenberg on March 4th he did so with the purpose and the clear intent to engage Greenberg's services to acquire Ashland shares for First City's account, and ultimately to achieve complete control of the company. Following that call,

monies was highly irregular and demonstrates the extent to which defendants would go to silence discussions of their accumulations in Ashland. Without further explanation of the payments it is difficult to escape a finding that

this was an outrageous abuse in management of a public corporation and a blatant violation of fiduciary duties. More importantly, it adds to the pieces of evidence supporting the Court's findings and conclusions.

Greenberg immediately acquired 20,500 shares of Ashland. With that purchase, First City crossed the five percent threshold and the 13(d) clock began to tick. The obvious importance of the March 4th and subsequent conversations requires a careful parsing of both Belzberg's and Greenberg's account of the telephone calls and a review of their subsequent actions and statements.

While Belzberg asserted that he was merely recommending to Greenberg that Ashland presented a promising investment opportunity, his testimony was self-serving, inconsistent with his later actions and did not square with the objective evidence. Indeed, the sequence of events immediately preceding the early March telephone call together with the subsequent conversations, support a finding that around that time, Belzberg had formalized an intent to secure Ashland shares, and to hold them in a "parking arrangement" until some appropriate future date.

On March 4th when Belzberg telephoned Greenberg, he mentioned Ashland as an attractive buy. In recalling the conversation with Greenberg, he testified: "First of all, Ashland stock was cheap ... I didn't think the stock was going to go down, so I didn't think [Greenberg] could lose money on the stock." (Tr. 314.) Indeed, nor would First City be at risk if Ashland were subject to a put/call agreement.

Before talking with Greenberg, Marc had neither consulted with his father nor with Robi Blumenstein his close associate. (Tr. 417, 418.) As were most of his conversations with Greenberg, this one was brief and cryptic. Greenberg remembered the conversation during his investigative deposition:

> He called me and said something to the effect that ... it wouldn't be a bad idea if you bought Ashland Oil.... I took that to mean that we were going to do another put and call arrangement that we had done in the past.

(AG–I at 18–19.)

*Greenberg's Understanding*

It is clear from the outset that Greenberg understood and responded to Marc's conversation as a request to purchase shares for First City's account pending a formal put/call agreement[5] at some future date.[6] His first record of the Belzberg conversation was set forth in the Ashland Oil Chronology. (Px 4.) The Chronology was prepared by Mr. David Hyman, Bear Stearns' compliance director.[7] Hyman responded on behalf of Bear Stearns to a Commission request for "a chronology of events describing Bear Stearns' contacts with First City." The Chronology, dated April 11, summarized, *inter alia,* the March 4 Belzberg/Greenberg conversation:

> Alan Greenberg, CEO of Bear, Stearns, received a phone call from Marc Belzberg of First City Financial Corp. in which *Mr. Belzberg asked that Bear, Stearns begin accumulating Ashland Oil stock.* Mr. Greenberg understood this to mean, as in the case of other securities purchased by Bear, Stearns in which First City had an interest, that as soon as Bear, Stearns had accumulated a

---

5. Under such agreements, Greenberg purchased stock shares and, rather than placing them in a First City account, placed them in a Bear Stearns' proprietary account. Bear Stearns would then grant First City an option to "call" the shares at an agreed price per share (the "strike price"). At the same time First City granted Bear Stearns an option to "put" the stock to First City at the same price. The agreement resulted in Bear Stearns holding the shares in name only while First City assumed the market risks of ownership. Defendants concede that under the put/call arrangement they are beneficial owners of the shares for purposes of section 13(d). The agreements are risk free transactions for Bear Stearns.

6. Defendants argue that Greenberg's understanding alone is insufficient to prove that the two had an "understanding" for purposes of conferring beneficial ownership. The Court agrees. However, the undisputed nature of Greenberg's understanding merely underscores the central factual issue in this case: Belzberg's intent.

7. Before joining Bear Stearns, Hyman had more than 20 years experience in SEC enforcement law, including nine years with the Commission's Enforcement Division. He consulted with Greenberg before preparing the Chronology and submitted a draft to him for comment and review before filing it with the Commission.

sizable position, we would enter into a written put and call agreement with First City. Thereafter, Mr. Greenberg, using his own judgment, acquired shares on the floor of the New York Stock Exchange, and generally advised Mr. Belzberg or his office each day of the number of shares acquired. (emphasis added)

At trial, defendants challenged the Chronology on hearsay and other grounds. Their motion to exclude from evidence and from consideration was denied by the Court on January 4, 1988. Greenberg's recollection of the conversation was creditable and warranted favorable consideration. It was given before Greenberg had any concrete knowledge about the specifics of the SEC's investigation into the Ashland transaction. But more important, it was later confirmed on May 14, 1986 in Greenberg's sworn testimony at the investigative hearing before the Commission. When asked about the March 4th telephone conversation, his testimony was clear and unequivocal:[8]

When he called me on this, because of [our] previous conversation, I just assumed this would have meant we were doing another put and call. I didn't press him on it. Our relationship is, you know, it's not legalistic when I talk to him....

I did start buying stock. *I was absolutely under the impression I was buying at their risk and I was going to do a put and call,* which we've done, ... for many years, with other people, not just him. (emphasis added)

(AG–I at 20.)

*Events Following the March 4th Telephone Call*

Greenberg's subsequent conversations and actions *after* the March 4 call, were fully explored and explained at that same

May 1986 hearing. Portions of his testimony provide a reliable, accurate and early account of his actions and statements. His response to various questions follows:

Q. Did he [Marc Belzberg] give you any instructions on how much to accumulate?

A. No.

Q. Did he tell you anything about price?

A. No.

Q. So, when you say you started accumulating it, what did you do?

A. Started buying stock.

Q. How did you do that?

A. Put an order in on the floor of the Stock Exchange. Said, 'just go an along and buy it.' I bought it for the firm of Bear Stearns, just a normal trading account.

I think that when I got the tickets back ...I said ... 'Put this in the account that we usually put principal transactions in, where we are going to do a put and call arrangement some subsequent date,' and he did.

*Id.* at 20, 21.

\* \* \* \* \* \*

Q. Did you give any instructions on how much to buy?

A. Yes every day. Made out a ticket every day, every couple days—I don't think every day, but every couple days, I think. When I was talking to Mark I'd say, 'I now own 150,000.' He'd say, 'Fine.'

... in doing these transactions, with put and calls ... when we did one of these things, we would give a report every day to figure out mathematically what price to make the strike price on the put and call and it got too cumbersome.

---

**8.** Defendants argued that deposition testimony is inferior to live testimony; that the Commission's reliance on such testimony constituted an admission that its case was weak; that the Commission could have prevailed upon the deposition witnesses to testify at trial but deliberately avoided calling the witnesses by filing this action in the District of Columbia, where they were beyond the reach of a subpoena.

The argument rests on the assumption that if the deposition witnesses had testified before the Court, they would have told a different story than in their deposition—a story that would have supported defendants' position and undermined the Commission's views. Defendants' attempt to ascribe such motives to the Commission's choice of venue is unsupported and meritless.

We then started waiting three or four days, accumulating a lot, a week—taking other securities, because it got too much trouble sending those damn letters up every day and writing them. We would just then accumulate the position and then just write one letter, and I would compute the interest lost into the price.

*Id.* at 21, 22.

\* \* \* \* \* \*

Q. Mr. Greenberg, I am sorry. I want to clarify this. Did you testify previously that this was or was not a risk free transaction for Bear Stearns because of the put and call agreement?

A. In my opinion, from the day we started buying this, we were at no risk.

Q. Because?

A. I was going to do a put and call with him at a subsequent date when I accumulated enough to make it worthwhile, whether 200,000 or 350 or 400, we were going to send a letter up. The trouble with sending up the letters every day, Mark was out of town and so then we'd start combining the letters. Finally I said, 'Just stop. Instead of sending a letter every day we will do it in four days or ten days. whenever we have a decent amount.'

*Id.* at 25.

\* \* \* \* \* \*

Q. You also stated that you called Mark Belzberg each day to tell them—

A. No. Somebody said that. I didn't say that. I am not sure I called him each day. Could have been every two days or three days. He did a lot of traveling during that period.

I think it was impossible, probably, to talk to him every day. When I talked to him, among other things .. we were doing other business at that time besides just Ashland—I would discuss and say *'By the way, I am now along';* he'd say, *'Fine, keep going,'* or something to that effect. (emphasis added)

Q. That was his only reaction?

A. Yes. Right.

*Id.* at 26, 27.

In short, over the period, beginning Monday, March 4 continuing through Friday, March 14, 1986, the record shows that Belzberg and Greenberg conversed frequently, discussing various securities transactions including Ashland Oil. On those occasions Greenberg would comment on his growing purchases of Ashland and, in turn, Belzberg would reply with words of encouragement.

The trial transcript also shows that Belzberg well knew the extent of Greenberg's acquisition efforts. In response to further inquiries concerning their conversations, he testified:

... [D]uring the first two weeks of March ... I had numerous conversations ..., and Ashland Oil came up a couple of times.... I would say two or three times during that period Mr. Greenberg informed me that he had bought a certain amount of stock. He did not give me a cumulative total of how much ... he simply said you know I bought X thousands of shares the other day.

Q. ... did you know how many shares he had bought in total?

A. No, I did not keep a running total of the number of shares in my mind.

(Tr. 318–19.) However, it was well known that Marc could keep abreast of Greenberg's transactions because as he testified "... I have a [computer terminal] ... on my desk, which has stock quotes on it so I can see what's happening. I can in effect monitor what the broker is doing, see the volume of the stock, the price movements of the stock." Tr. 298.

Between March 4 and 14, Greenberg accumulated 330,700 shares of Ashland for First City, holding them in a Bear Stearns arbitrage account. In doing so, Greenberg committed more than $14 million of Bear Stearns' capital in purchasing the shares. When the stock was amassed, Belzberg never asked why Greenberg was divulging to him the amount of Ashland purchases, nor any other reasonable question to clarify why he was volunteering such information. If, as defendants' counsel claim,

there was a misunderstanding, then one would expect Belzberg to have inquired why Greenberg was sharing information concerning Bear Stearns' acquisition efforts. Otherwise, such exchanges of information between two busy stocktraders, were pointless exchanges of trivia.

*The Summit Meeting—the Decision to Exceed Five Percent*

On the weekend of March 15 and 16, Marc met with his father and uncle, William Belzberg in Los Angeles, to discuss among other matters, the future of their Ashland holdings. On Sunday March 16, the matter was presented by Marc Belzberg. The three considered reports and studies on Ashland's operations for approximately one hour. After Marc's recommendation and following some added discussion, Samuel Belzberg made a definite decision to move ahead. During the discussions Marc confidently advised his father that Greenberg had purchased a block of Ashland shares which "First City could acquire quickly." (Px 40 ¶ 9.) (TR. 426.) Those bold assurances add further support to a finding that he had effectively created a "parking arrangement."

Samuel Belzberg had no prior knowledge of Greenberg's accumulation.[9] His ignorance contrasted sharply with the family's usual routine to communicate closely on business matters. Samuel Belzberg had previously testified directly that he and his son spoke with one another "usually once a day, and more so when we are doing something." (Tr. 473.) Nonetheless, Marc had never revealed that he discussed Ashland Oil with Greenberg. In light of their usual confidences, Marc's failure to inform his father of these important developments also supports the conclusion that Marc sought to "park" the shares with Greenberg.

Two otherwise harmless appearing exhibits cause further doubt that defendants waited until March 16 to proceed beyond the threshold limit. On March 11 and 14, 1986, Brad Van Tassel, Manager of Page

Consultants, addressed letters to Gordon Wolf, a First City Capital analyst. The exhibits (Px 64 and 65) serving as transmittal letters for certain Pace reports, included telling and revealing comments in a final paragraph:

I would be happy to accompany you in any *negotiations* with Ashland, and or *assist in the acquisition as needed.* (Px. 64.) (emphasis added)

I look forward to talking with you on Monday [March 17] to determine how Pace can assist First City Capital *in continuing work on the acquisition of Ashland.* (Px. 65) (emphasis added)

*The March 17th Put/Call Agreement and Subsequent Events*

Upon returning to New York City the next day, Marc immediately called Greenberg and arranged for a written put/call agreement covering the 330,700 Ashland shares. In his March 17 telephone call Marc did not discuss at all the price of the shares, (MB–II at 85; Tr. 436), but merely told Greenberg "I would like to buy [my] appetite [I have] a large appetite." (MB–I at 38.)

Belzberg claimed that he then believed the stock belonged to Bear Stearns. But if in fact he believed that such was the case, it was most irregular to place such a large order without first discussing and agreeing on a purchase price. Indeed, he maintained that he "always" specified the number of shares and range in price when placing an order. (Tr. 288, 297–99.) Belzberg then explained that this omission was part of a deliberate "negotiating decision" since this was his first purchase of stock owned by Bear Stearns. (Tr. 445–446.) Such an explanation strains credulity. The logical inference from his omission is that there were no doubts surrounding the purchase price. Belzberg had acquired the shares on the initial dates of purchase and merely expected to pay Bear Stearns' cost plus commission. If there were an issue about price, at the very minimum, one would have

9. An entry in Samuel Belzberg's personal desk diary for March 15, the day *before* the meeting, reads "Ashland = Ace Greenberg (Pls. ex. 69). Samuel Belzberg had no recollection and could offer no explanation of this entry. (S.B. at 206–211.)

expected Marc to have conferred with his father before departing from the course of a prudent businessperson. The trial record does not show any such conversations.

Following the telephone call, Greenberg prepared and forwarded to Belzberg a put/call agreement covering all Ashland shares then acquired by Bear Stearns. When Belzberg received the agreement some days later, it was only then that he became aware that Greenberg had charged a strike price of $43.96, well below the March 17 market quotation of $45.37. The total price covered by the agreement for the nearly 331,000 shares was more than $450,000 *below* the market quotation.

Belzberg expressed no surprise when he realized that First City was being charged much less than the prevailing market. Nor did he share this particular item of good news with his father who certainly would have been interested. (Tr. 431.) He believed that Greenberg was simply acting as "Santa Claus," attributing his generosity to the steady business which First City had funnelled to Bear Stearns.

Yet Belzberg had no basis for characterizing Greenberg as "Santa Claus." Never before had he sold a block of shares to the Belzbergs from the Bear Stearns inventory at a price below market. (Tr. 427.) Greenberg corroborated that such transactions were never made; he never gave clients such a break in price "You go broke in a week if you do that." (AG–I at 30.)

Greenberg included with the original put/call agreement a chart reflecting the dates when the shares were purchased, with interest charges calculated from the dates of purchase. When Blumenstein reviewed the materials he was alarmed. As

a knowledgeable securities law attorney responsible for First City's section 13(d) compliance, he recognized that computation of the strike price might suggest that Greenberg had purchased the stock on First City's behalf, thus placing the company in the role of a beneficial owner prior to March 17. Robi Blumenstein had no knowledge of the earlier telephone calls between Belzberg and Greenberg, nor the circumstances under which the shares had been purchased. He immediately approached Belzberg and advised that the situation be clarified with Greenberg. (RB at 153–54, 173–76.) Belzberg had not read any of the papers but he agreed with Blumenstein.

Thereafter, in a brief telephone call, Belzberg advised Greenberg that the letter was incorrect and that he was purchasing the Ashland shares as of March 17. According to Belzberg, Greenberg agreed "[y]ou're right, the letter's wrong,[10] I didn't read it before it went out, throw it out and I will send you a corrected copy." (MB–II at 143–44.) [11]

The conversation ended with Belzberg offering and volunteering to buy the shares at a higher price of $44. That price was one which Belzberg "just picked out of the air." (MB–I at 42, 43.) His trial testimony was more revealing: "[I] rounded the number up to $44 because [I] did not want the price I was paying to relate to [Greenberg's] cost." (Tr. 449–50.)

The amazing part of these events is that Greenberg could not recall a discussion of the strike price adjustment with Belzberg nor could he recall seeing a put/call providing for a $43.96 strike price, or having talked to anyone about a revised letter.

**10.** After the letter was sent out, Greenberg was informed that there had been a miscalculation of the interest rate; thus Greenberg sought to replace the letter to correct his company's mathematical error.

**11.** Neither Greenberg nor First City had a record of the original agreement. As noted, Greenberg told Marc to discard the old agreement. Later Blumenstein advised Perry and Wolf to clean out their files and throw out all extraneous and out of date documents. He later checked to make sure that they had done so.

Blumenstein testified at trial that it was a "general course of our upkeep of our files that we discard any out-moded superseded or duplicate information." Tr. 678–684.

The Commission suggested that defendants deliberately destroyed the document to conceal evidence that the agreement was linked to Greenberg's costs. However, First City did provide the Commission with a chart showing all documentation concerning its purchases of Ashland. That chart included the original transaction showing the original canceled strike price.

(AG–II at 105–9.) He contended that First City—not Bear Stearns bore the market risk on the 330,700 Ashland shares and thus, it would have been improper for his company to adjust the price up. (AG–I at 31, 46–48.)

While Belzberg insisted that his motives were innocent, the Court finds otherwise. Offering a higher price per share was inconsistent with First City's financial interests and company practices. He admitted that his offer "did make a difference"— costing First City an additional four cents a share. (MB–II at 154.) Never before had he offered Greenberg or any broker more than their asking price. *Id.*

*Events After the Written Put/Call*

Between March 17 and March 26, First City acquired an additional 890,000 shares of Ashland; in doing so several put/call agreements were executed with Bear Stearns. On March 25, 1986, in an attempt to facilitate a friendly takeover, Samuel Belzberg wrote Ashland's management, indicating that First City wanted to take control and offering to purchase the company's remaining shares. Ashland rebuffed the invitation. Instead, it issued a press release announcing that the Belzberg family had acquired a substantial stake in the company. On the first trade of the day when the market opened, the price of Ashland rose almost ten percent. On the following day, March 26, First City filed the required Schedule 13D Statement notifying the public that the company had accumulated approximately .9 percent of the publicly traded shares in Ashland.

In an effort to block First City's takeover offense, Ashland lobbied the Kentucky legislature urging it to enact antitakeover measures. The legislature promptly responded and enacted legislation thwarting efforts of First City to finance an acquisition. Faced with a hostile Ashland management and an equally hostile legislature, First City conceded and abandoned further efforts. However, before

retreating, it negotiated a buy-back agreement which provided that First City would not purchase any Ashland shares for at least 10 years. But more important, the agreement provided that First City would sell back at $51 the 1,409,100 shares it had acquired. This resulted in a hefty profit of approximately $15 million. In the world of finance and trade this is regarded as "green mail." [12]

The magnitude and circumstances surrounding the profits received by defendants from their greenmail enterprises caused the Commission to institute an investigation. On March 31, 1986 the Commission staff addressed requests to both First City and Bear Stearns in connection with an "informal inquiry concerning matters arising out of ... Schedule 13D ..." filing by First City. The companies were also asked to provide a chronology of events describing their respective contacts with each other concerning Ashland Oil. Alan Greenberg and Marc Belzberg were deposed before the Commission staff on May 14 and May 29, 1986, respectively. On July 30, 1986, the SEC authorized the filing of a civil injunctive action against defendants, First City and Marc Belzberg.

*The Factual Support for Defendants' Theory—That Greenberg "Misunderstood" Belzberg, Is Weak*

The key defense advanced by defendants' counsel is that Greenberg "misunderstood" the March 4th telephone conversation and that subsequent events were the result of this misunderstanding. While at first blush, the argument appears plausible, defendants failed to make a credible showing. Rather, the facts and events support a finding that Greenberg correctly understood Belzberg's instructions to purchase Ashland shares on behalf of First City.

The original and only support of a misunderstanding comes from Belzberg's own subjective conclusions that such was the

---

**12.** A December 1986 news item, *Most Active Greenmailers,* authored by Don Dorfman speaks of the Belzbergs as greenmailers "who are estimated to have made between $55 million and $65 million—and possibly a good deal more—by greenmailing at least five known Big Board companies this year." Listed among the five companies were Ashland Oil and Hartmarx. Dorfman, New York/December 22–29, 1986, at 34.

case, with a somewhat belated acknowledgment by Greenberg. Belzberg's testimony concerning the early March telephone call and his intent is self-serving and necessarily viewed with caution. First, it must be remembered that Belzberg suggested that Greenberg misunderstood the March 4th telephone conversation several weeks *after* March 31, 1986, when the Commission had commenced its investigation. (MB–II at 166–73.) In detailed chronologies submitted to the Commission only weeks after the events occurred, neither Bear Stearns nor First City's counsel—Davis Polk & Wardwell, mentioned any misunderstanding between Belzberg and Greenberg relating to the latter's purchases of Ashland shares during the period March 3–14. (Px 4, 25.)

The timing of Belzberg's "realization" of a misunderstanding by itself is highly suspect. The manner in which he advised Greenberg of the alleged misunderstanding is equally troublesome. The notion of a misunderstanding first arose in two telephone conversations within a week to 10 days after the Commission's investigation commenced. The two conversations took place within a few days of each other and *after* Belzberg was aware that Greenberg would be called to testify.

It was only after the second conversation, sometime in April, that Greenberg first acknowledged the possibility of a misunderstanding. Some months later, however, in his affidavit of July 3, 1986, he claimed that he could have misunderstood Belzberg's statements of March 4th. The Court discounts this belated four-months statement, and credits Greenberg with his original recollection, declared well before his conversation with Belzberg. Nor can it be overlooked that Greenberg's affidavit was prepared by *First City's* counsel rather than Bear Stearns. Indeed, Greenberg in his deposition, could not even recall reviewing the statement: "I think they [somebody from Belzberg's organization] sent it over and I think I looked at it—felt it was accurate and signed it." (AG–II at 34.) The fact that his statements were based entirely upon Belzberg's insistence that a misunderstanding existed undermines their evidentiary value.[13]

Further, the reasons Belzberg offered to support the existence of a misunderstanding are far from persuasive. Significant disagreements and contradictions surround each reason, which in turn undermine any supportive value to the defendants. Belzberg contended at trial that he informed Greenberg that First City was at a 4.9 or five percent filing threshold and could not purchase additional stock. Yet in his first deposition Belzberg was far less certain. "I think I did but I do not recall for a fact." (MB–I at 23.) In his pretrial deposition he was even less certain and could not recall if he had told Greenberg that the company had a significant position in Ashland. (MB–II at 63.)

As to this entire matter, Greenberg flatly denied Belzberg's assertion and insisted that:

> he never told me then or at any time whatever they owned in anything and I never asked them ... positive ... I never asked them, they never disclosed to me what they were doing. Just didn't and does not happen.

(AG–I at 35–36; AG–II at 78.)

Similarly, inconsistencies plague Belzberg's assertion, that he had received no written put/call agreements for the two week period in March and, therefore, had no reason to think that Greenberg was purchasing shares for First City. First, this reason *assumes* a misunderstanding and merely explains Belzberg's belated realization. It sheds no light on the central question: whether, in fact, a misunderstanding existed. Equally important is

---

**13.** It bears notice on one hand that defendants characterize Greenberg as a shrewd executive officer; yet, when his testimony undermines their position, they characterize him otherwise. Thus, they contend with little support at all, that his assumption that he was buying Ashland for the Belzbergs was "totally illogical." Defendants' Post Trial Brief at 34. Defendants cannot have it both ways. It is doubtful that a person who presides over the affairs of a major brokerage house and maintains a reputation such as Greenberg's, would respond to the situation at hand in a "totally illogical" fashion.

that Belzberg's expectations of daily put/calls were unrealistic. There was a clear showing that there was no consistent pattern in the time interval between an oral put/call agreement, the preparation and execution of the agreement, and its dispatch to First City. Deposition David Hyman, Dec. 16, 1987, at 39–40. Further, First City had previously entered into only six prior put/call agreements with Bear Stearns, each reflecting different timing sequences. More importantly, Greenberg denied that his firm had a policy of mailing put/calls the day after each purchase. Bear Stearns had determined that entries of daily transactions were unnecessary, burdensome, and therefore distributed confirmation reports on a delayed basis. (AG–I at 22.) Greenberg was "sure" that Bear Stearns had advised First City about the policy change. (AG–II at 92.)

Finally, contradictions surround Belzberg's added reason, mainly, that his advice concerning Ashland was no different from his suggestion that Bear Stearns purchase shares in Hartmarx. While the Court does not necessarily accept the Commission's suggestion that incident provided a "dry run" for the Ashland parking arrangement, it also rejects Belzberg's claim that Hartmarx provides a complete exoneration.

The Hartmarx situation requires a brief explanation. In late 1985, Belzberg asked Greenberg if Bear Stearns could acquire additional Hartmarx stock in an arbitrage account subject to a put/call agreement, with the understanding that First City would protect Bear Stearns against any risk of loss. Greenberg advised that once First City assumed all the risk it would become the beneficial owner under 13(d). After confirming this with his lawyers, Belzberg had an extended conversation with Greenberg where he "clarified in detail that if he [Greenberg] wanted to buy [Hartmarx], it was his stock, he had the upside and he had the downside." (Tr. 318.) That extended conversation was in stark contrast with their usually "brief" and "cryptic" conversations. Thus, if anything, the Hartmarx precedent demonstrates that when Belzberg did not want to

purchase stock but only advise Greenberg on investments, he clarified his intentions. When he wanted to purchase stock, however, he issued his order with one of his normal brief conversations. March 4th was one of those brief and cryptic conversations.

Defendants' remaining contentions also fail to support the existence of a misunderstanding. Belzberg's claims that he could not have possibly asked Greenberg to purchase stock because he had no authority to do so and he never made major investment decisions without consulting his father or his "right hand man" Blumenstein, are simply not supported by the record.

His past conduct refutes the assertion. He never consulted his father nor Blumenstein before he asked Greenberg to purchase Hartmarx shares. He did not disclose to his father the problems with the March 17 put/call agreement, the decision to abandon Alan Alan and the Katz–Goldring brokerage firm and switch to Bear Stearns, or the decision to offer Greenberg the higher strike price of $44 per share. Further, his argument that he could not have broken the law because an unwritten company policy forbade him from doing so, is ridiculous. If the federal securities laws are not sufficient deterrents, why would company policy prove to be more formidable?

## III.

## LEGAL ANALYSIS

*The Alleged "Honest Undisputed Misunderstanding"*

This case fits neatly within the proscriptions of section 13(d) of the 1934 Act. The Court has already found, based on credible testimony, that during February and March 1986, Marc Belzberg, on behalf of First City, engaged in sustained efforts to purchase equity shares of Ashland Oil. In doing so, defendants acquired, largely through nominee accounts, more than 5 percent of the company's shares while failing to file the required Schedule 13D Statement in a timely fashion. In securities

trading language this is a parking arrangement—a concealment of stock ownership achieved by placing the stock in an account in the name of a third party.

 Defendants' major response to the Commission's challenge is that Greenberg misunderstood the March 4 telephone conversation and that Belzberg did not authorize any further Ashland purchases until March 17. This matter was discussed in some detail *supra* pp. 712–715, *et seq.* It is examined at this time, only for consideration of the legal principles involved and to be applied to the contentions of the parties.

Other than Belzberg's testimony, the principal evidence of the "honest undisputed misunderstanding" is Greenberg's affidavit of July 3, 1986. Clearly, the affidavit is not admissible evidence of Belzberg's intent. Rule 602 Fed.R.Evid. It is hornbook law that "what the witness represents as his knowledge must be an impression derived from the *exercise of his own senses*, not from the report of others." II Wigmore, Wigmore on Evidence §§ 657 at 889 (1979 ed.); 3 Weinstein, Weinstein's Evidence, § 602[2] (1987 ed.); 10 Moore, Moore's Federal Practice, § 602[3] (1988 ed.); *Randolph v. Collectramatic*, 590 F.2d 844, 847–48 (10th Cir.1979). While witnesses may testify to another person's state of mind, the testimony must be predicated upon personal perceptions and observations. *John Hancock Mutual Life Insurance v. Dutton*, 585 F.2d 1289, 1294 (5th Cir.1979) (witness who observed altercation allowed to testify on whether victim subjectively believed that the assailant, his wife, would carry out her threat to shoot him). Personal knowledge may not be based on the statement of another. *United States v. Owens*, 789 F.2d 750, 754 (9th Cir.1986), *rev'd on other grounds*, ─── U.S. ───, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

Greenberg's acknowledgment in his affidavit that he may have misunderstood Belzberg was predicated *solely* upon the latter's suggestions and statements that such a misunderstanding occurred. His conclusion was *not* based on his own personal knowledge or rational perceptions.

Indeed, it is undisputed that Greenberg himself interpreted the March 4th call as an order to purchase shares on behalf of First City. It was only *after* he had conferred with Belzberg, who told him that such a misunderstanding occurred, that he acknowledged the possibility. The last two paragraphs of Greenberg's affidavit support this finding:

I understand that Mr. Belzberg *apparently* had a different understanding of our conversation on March 4, 1986, and believed, *as he expressed to me later* on March 17, 1986, that he simply suggested that Bear Stearns purchase Ashland shares for its own account—not pursuant to any put/call arrangement. Mr. *Belzberg told me at that time that he had not intended* a put/call arrangement, and that he did not feel he had given me an order or guaranteed me against risk in any way, shape or form.

While I did not interpret our conversation of March 4 in this way, I can *in retrospect* understand how Mr. Belzberg could have had such an understanding based on the conversation that we had and based upon certain of our prior business dealings. Accordingly, *I believe* that our conversation resulted in an honest misunderstanding between us. (emphasis added)

Because his conclusions were based on the statement of others, they are not admissible under Rule 602.

Nor is Belzberg's own subjective declarations as to his intent determinative of whether there was a misunderstanding with Greenberg. The question of intent must be determined based on objective, not subjective, criteria. *Brobeck, Phleger v. Telex Corp.*, 602 F.2d 866, 873 (9th Cir. 1979) (Court "looks to objective, not subjective criteria, in ascertaining the intent of the parties"). Because Belzberg's statements are necessarily self-serving, they carry little, if any, evidentiary weight.

### The Statutory Framework

The securities law violation in this proceeding involves an interpretation of the 1934 Act itself and the SEC rules promul-

gated thereunder. Section 78m(d)(1) of the Act provides in part:

(d)(1) Any person who, after acquiring *directly or indirectly* the *beneficial ownership* of any equity security ... is *directly or indirectly the beneficial owner of more than 5 per centum* of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, ... to each exchange where the security is traded, and file with the Commission, a statement containing ... the following information, and such additional information, as the Commission may prescribe ... as necessary or appropriate in the public interest or for the protection of investors.

(emphasis added).

The SEC rule, 17 C.F.R. § 240.13d–3, provides the criteria for determining beneficial ownership and are stated broadly in paragraph (a):

For the purposes of Sections 13(d) and 13(g) of the Act *a beneficial owner of a security* includes any person who, *directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise* has or shares

(1) Voting power which includes the power to vote or to direct the voting of, such security; *and/or*

(2) Investment power which includes the power to dispose, or to direct the disposition of, such security. (emphasis added)

Subsequent paragraphs of the rule present and explain other criteria. Paragraph (b) provides that "any person who creates ... an arrangement ... with the purpose of ... preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) ... shall be deemed ... to be the beneficial owner of such security." Paragraph (c) provides that "all securities ... beneficially owned by a person shall be aggregated in calculating the number of shares beneficially owned by such person." Paragraph (d) provides that a person is deemed to be the beneficial owner of shares that he may acquire by the exercise of an option or similar device.

The Commission has stoutly contended throughout that Belzberg was the beneficial owner of the Ashland shares based upon his "understanding" or "relationship" with "Ace" Greenberg and that he could "call" up the block of shares deposited in Bear Stearns' proprietary account at any time. And as noted, defendants have disagreed that Belzberg had an understanding with Greenberg, but contend, that there was an "innocent misunderstanding." They implicitly suggest that an "understanding" under section 13(d) requires some form of written or formal documentation. The fact that there was no such documentation before March 17, they further contend, proves that First City could not have been the beneficial owner until that date. They argue that Belzberg had a "reasonable expectation" that the block of shares could be purchased from Greenberg at some point in the future. Defendants' counsel relies principally on *Transcon Lines v. A.G. Becker Inc.*, 470 F.Supp. 356 (S.D.N.Y.1979) (a mere expectation of future acquisitions does not rise to the level of beneficial ownership) to support their position.

■ Defendants' argument is flawed. Section 13(d) does not require a formal documentation of arrangements. Indeed, the regulation's broad and inclusive language that a beneficial owner is created by "any contract, arrangement, understanding, relationship or otherwise," expressly refutes defendants' position.

Beneficial ownership may arise out of "arrangements" and "relationships" as well as "contracts" and "understandings." Legal title to the stock is not necessary; nor does it turn on who is the registered owner, or in whose name the stock is held. As a leading treatise explains, the concept "focuses on any relationship that, *as a factual matter,* confers on a person a significant ability to affect how voting power or investment power will be exercised, because it is primarily designed to ensure timely disclosure of market-sensitive data about changes in the identity of those who are able, as a practicable matter, to influence the use of that power." (emphasis

added) 3 A.A. Sommer, Jr., Securities Law Techniques § 70.07[2][c] (1987). As explained by former Senator Williams of New Jersey, a vigorous sponsor of amendments to the Act, the disclosure provisions of 13(d) are "the only way that corporations, their shareholders and others can adequately evaluate ... the possible effect of a change in substantial shareholdings." 113 Cong.Rec. 855 (1967).

Courts have uniformly interpreted the term "beneficial owner" liberally and repudiated the need to have an "arrangement" memorialized in writing to trigger the filing requirement. Our own Circuit Court expressly rejected such a narrow interpretation as inconsistent with the language of Section 13(d) in *Securities and Exchange Commission v. Savoy Industries, Inc.*, 587 F.2d 1149, 1187 (D.C.Cir.1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed. 2d 462 (1979).

> The use of "any," "understanding," "relationship," and "other arrangement" emphasizes the notion that concerted action need not be formalized or express.... Surely, the broad language demonstrates an unmistakable congressional intent to bring pooling arrangements within the purview of section 13(d)(3), irrespective of whether they be formal or informal, written or unwritten.

Further, this results seems dictated by common sense. A contrary interpretation would exalt form over substance, as

.. disclosure ... would hinge on the degree of formality of the arrangement. *See also Wellman v. Dickinson*, 682 F.2d 355, 363–367 (2d Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *GAF Corporation v. Milstein*, 453 F.2d 709 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972).

Defendant's view and reaction to 13(d) exalts form over substance and would encourage, indeed reward, secret accumulation of stock in a company. Under their narrow interpretation, potential investors would be able to circumvent the Schedule 13(D) filing requirements merely by entering into informal, undocumented agreements with their brokers. Such a narrow construction would thwart the very purpose of section 13(d) "to require full disclosure of information by persons who have acquired a substantial interest in the equity securities." S.Rep. No. 550, 90th Cong. 1st Sess. 7 (1968).[14] Indeed, as our Circuit pointed out in *Savoy*, the 1934 Act was designed to "to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control." 587 F.2d at 1167.[15]

■ Defendants' second argument that an understanding can only be proven by some form of documented evidence must be rejected for the same reasons as their first, concerning the nature of an under-

---

**14.** The provision is designed to obtain disclosure of ... any person obtaining the benefits of ownership of securities by reason of any contract, understanding, relationship, agreement or other arrangement.

S.Rep. No. 550, 90th Cong., 1st Sess. 8 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess. 8–9 (1968) *reprinted in* 1968 U.S.Code Cong. & Admin.News, 2811, 2818.

**15.** Defendants also suggest that because the regulation provides for a 10 day window within which to purchase stock before making their acquisitions public, its "very purpose ... is to permit continued secret accumulations beyond the 5% threshold." Defendants' Reply Brief at 8. Their suggestion that Congress promulgated the Act to protect secret accumulations by potential bidders is repudiated by the legislative history and by Supreme Court jurisprudence.

Just this term the Supreme Court reaffirmed the "fundamental purpose of the [1934] Act as implementing a 'philosophy of full disclosure.'" *Basic Incorporated v. Levinson*, —— U.S. ——, 108 S.Ct. 978, 982, 99 L.Ed.2d 194 (1988). Although *Basic* concerned violations of Rule 10–b 5, the discussion of the purpose of the 1934 Act relates to all the various rules promulgated thereunder including Section 13(d). In *Basic* the Court refused to adopt a standard of disclosure based on the existence of an "agreement-in-principle" and held that even *preliminary* merger negotiations if "material" should be disclosed. It reasoned that the public should be provided *all* information indicating potential changes in corporate control because such information may impact upon investment decisions. Similarly, information that an investor has the right to purchase a block of shares may impact the public's investment decisions.

standing. Indeed, defendants' evidentiary argument is a back-door effort to severely restrict the effect of section 13(d). Written documentation is simply not necessary to prove the existence of an understanding for purposes of 13(d). Courts have routinely relied on circumstantial evidence and inferences from the testimony to determine "beneficial ownership." *See Wellman v. Dickinson,* 682 F.2d 355, 363–67 (2d Cir. 1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); *Financial General Bankshares, Inc. v. Lance,* Fed. Sec.L.Rep. (CCH ¶ 96,403) (D.D.C. Apr. 27, 1978) [available on WESTLAW, 1978 WL 1082]. Indeed, requiring formal documentation "could render nugatory the purpose of the statute." *Water & Wall Assoc., Inc. v. American Consumer Indus., Inc.,* Fed. Sec.L. Rep (CCH) ¶ 93,943, at 93,756 (D.N.J.1973) [available on WESTLAW, 1973 WL 383].

■ Written documentation of a formal put/call is neither conclusive nor even probative evidence of whether an understanding existed for purposes of 13(d) prior to the execution of the put/call agreement. There is no dispute that the parties entered into a written put/call agreement on March 17, 1986. The confirmation slips, put/call letters confirming the date and testimony of several witnesses were irrefutable. (Tr. 179, 196, 547–549.) But, Ms. Reed [16] also testified that the records did not reflect the date that Bear Stearns made the underlying purchases of the Ashland stock subject to a put/call. (Tr. 223–224). Her testimony confirmed that the date of the written agreement was not in any way relevant to whether the parties had reached an understanding at an earlier time. Indeed, defendants' emphasis at trial on the dates shown on the relevant written instruments merely obfuscated the core factual issue in this proceeding: whether Belzberg and Greenberg had an *informal* understanding prior to March 17.

Applying the factual findings to the legal standards of 13(d), the Court concludes that the Commission has shown by a preponderance of the evidence that Belzberg had an understanding with Greenberg as of March 4, 1986 to secure Ashland stock and should have filed a 13(d) statement 10 days thereafter. By failing to do so, defendants violated Section 13(d).

The facts and reasonable inferences emerging from the trial unmistakenly show that defendants deliberately attempted to circumvent the law. Marc Belzberg was readily convinced that Ashland Oil was a lucrative investment and a sure profit maker. He had no fear that his unilateral investment decision would have ruinious financial repercussions. Fortified with well documented analyses and advice from various sources, he called Greenberg on March 4th and directed him to accumulate Ashland equities. Greenberg responded immediately and purchased a sizeable block of Ashland shares over a two-week period. Belzberg's encouraging comments of "Fine, keep going," supported the existence of an understanding. Assurances to his father that Greenberg's block of shares were readily available, serve as further corroboration of a prior understanding. Finally, the fact that Belzberg obtained the block of shares at Greenberg's cost, considerably below market rate, support the existence of an earlier arrangement.

Indeed, Belzberg's receipt of all the profits flowing from the date of *Greenberg's* initial purchases of Ashland serve as prima facie evidence that the two had a prior understanding. As defendants' counsel urged in his closing argument: "the litmus test ... of who was the beneficial owner was who got the profit on that ... stock.... [c]onclusive proof as any you could find." (Tr. 837–838.) If the test urged by counsel is followed by this Court, defendants must be regarded as beneficial owners for indeed Marc Belzberg and First City received all profits from the transactions.

Nor does counsel's reliance on *Transcon* support defendants' position. Contrary to

---

**16.** Ms. Jackie Reed maintained First City's records of stock purchases, including its subsidi-

aries.

their suggestion, that decision did not suggest a bright line rule that an expectation of obtaining stock can never constitute an "understanding" for purposes of 13(d). The matter before Judge Leonard Sand was fact specific not legal in nature: whether the evidence demonstrated that the defendant possessed a right to acquire stock. Unlike this case, plaintiffs never contended that the defendant "presently has or participates in the exercise of either voting power or investment power with respect to any Transcon shares." 470 F.Supp. at 370. Plaintiffs failed to offer a shred of evidence showing a prior agreement in that proceeding. They relied solely on the fact that defendants had a close relationship which, they argued, created a hospitable climate for closing deals with a " 'wink of the eye' " or " 'friendly handshake.' "

Prefacing the decision with the comment that the case "presented difficult questions of fact concerning long standing relationships" Judge Sand concluded that the facts simply did not show that the defendant Rubenstein had a right to purchase shares and held:

> at the most, Rubenstein worked closely ... in developing the Transcon investment, and that he and Wender have a close personal and professional relationship such that he has a reasonable expectation of being treated 'fairly' if there should come a time when he is free to acquire Transcon stock. *Id.* at 370.

Further, the court noted that certain agency rules prohibited Rubenstein from acquiring shares in Transcon, a trucking line, unless he sold his own trucking company. "Thus even if Rubenstein has a right to acquire the stock, his exercise of that right ... is contingent upon a future event." *Id.* at 371.

In this proceeding, the Commission is not merely relying on the relations between Belzberg and Greenberg as the source of the understanding. It has proffered extensive and concrete evidence showing that Belzberg intended to commence a take-over effort of Ashland and had reached an understanding with Greenberg to begin accumulating stock towards achieving this goal. Contrary to the scant evidence in *Transcon,* the facts together with the circumstantial evidence show that Belzberg had more than "a reasonable expectation of being treated 'fairly.' " He had entered into an understanding with Greenberg which gave him a right to call the Ashland shares. Further, there existed no conditions precedent restricting First City's purchase of Ashland. It did not need to jump through any regulatory hoops before entering into a put/call agreement for shares of Ashland.

Defendants' surreptitious effort to accumulate a block of shares in Ashland is the precise type of evil to which Section 13(d) was directed to prevent. See *Savoy,* 587 F.2d at 1165 (quoting *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 59, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975)). Section 13(d) was designed as a broad disclosure provision to give shareholders and the market notice of potential changes in corporate control. Belzberg cannot circumvent the required filing requirements and hide his accumulations simply by delaying the execution of a formal, written agreement.

## IV.

## APPROPRIATE RELIEF

Having concluded that defendants have violated federal securities law, the Court now considers the question of the appropriate relief to be applied. The Commission has requested two forms of relief: first, an order granting a permanent injunction, prohibiting defendants from committing any future 13(d) violations; second, an order granting a disgorgement of all profits flowing from the violation.

*Injunction Prohibiting Future Violations*

Once a securities law violation has been established, the Commission is empowered to seek injunctive relief. Such relief does not flow automatically from a finding of wrongdoing. Among the factors that may be considered in determining the need for such relief are: whether there is a reasonable likelihood of repeated violations in the future; whether the violation was an

isolated incident or represented repeated and persistent conduct; whether the violation was flagrant or only technical in nature; whether there is the likelihood that defendant's occupation will present opportunities for future violations; whether a defendant recognizes the wrongful nature of his conduct and the sincerity of his assurances against future violations. *Savoy Industries, supra,* at 1168; *SEC v. Commonwealth Chemical,* 574 F.2d 90, 100 (2d Cir.1978); *SEC v. National Student Marketing,* 457 F.Supp. 682, 715–16 (D.D.C. 1978).

While the parties are in general agreement as to the standards relied upon, it is not surprising that they part ways in the application of any standard to this litigation. Defendants contend that injunctive relief is inappropriate, that injunctions are never proper remedies for 13(d) violations, by characterizing the law as "a technical reporting rule." (Def. Pre–Trial Brief at 25). Their attempt to trivialize the purpose of that section of the Act is rejected. Section 13(d) serves a vital public function to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, *Committee for New Management of Better Aviation v. Widmark,* 335 F.Supp. 146, 154–55 (E.D.N.Y.1971). Without the availibility of injunctions to prevent past violators from committing future violations, the deterrent effect of enforcement actions would be rendered nugatory. Recognizing this, Congress specifically provided for injunctive relief as a remedy for securities violations under both the 1933 and 1934 federal securities statutes. 15 U.S.C. §§ 77b and 78u(e) respectively.

The facts and circumstances surrounding defendants' violations support the imposition of an injunction. The deliberate nature of Marc Belzberg's actions support the inference that he may violate the laws in the future. He intentionally asked his broker to purchase Ashland on behalf of First City knowing full well the consequences, based upon his experience in the Hartmarx transaction. At the very least, his efforts to sidestep the filing requirements by securing an informal agreement amount to a "wanton or even careless willingness to take a chance on the legality of questionable transactions." *SEC v. Mono–Kearsarge Consolidated Mining Co.,* 167 F.Supp. 248, 261 (D.Utah 1958). *See also Chris–Craft Industries Inc. v. Piper Aircraft Corp.,* 480 F.2d 341 (2d Cir.1973), *cert. denied,* 414 U.S. 924, 94 S.Ct. 234, 38 L.Ed.2d 158 (1973). Moreover, the violations charged here, occurred in the context of an important segment of defendants' regular business—investing in publicly traded companies. There is also a public perception that defendants have been recent and active participants in heated takeover battles and unfriendly mergers. *Supra,* n. 1. *See SEC v. Everest Management Corp.,* 466 F.Supp. 167, 176 (S.D.N.Y. 1979) (Defendants' occupation, coupled with their deliberate past violation, strengthens the inference that they are likely to commit violations in the future).

While it is true that defendants have never before faced federal securities law violations, that alone, does not militate against imposing an injunction.[17] "First offenders are not immune from injunctive relief," *SEC v. Shapiro,* 494 F.2d 1301, 1308 (2d Cir.1974). Nor is defendants' decision to hire a full-time in-house counsel to monitor compliance with the securities laws, sufficient to ensure future compliance. (Tr. 373.) This is underscored by the fact that before Belzberg was snared by his own actions, he never consulted Robi Blumenstein, a very knowledgeable person, who was then among the 15 employees in the New York office. His representations that he will comply fully with the law in the future are self-serving and "neither ... conclusive or even necessarily persuasive, especially if no evidence of remorse sur-

---

**17.** Defendants' record is not completely unsullied. Just recently in this Courthouse, they settled with the Federal Trade Commission in a suit involving violations of the Hart–Scott Rodino Act. 15 U.S.C. § 18a(g)(1). See *United States v. First City Financial Corporation Ltd,* No. 88–0805 (Stipulation and Final Judgment entered April 1, 1988). That settlement arose out of the same transactions that are the subject of this proceeding.

faces until the violator is caught." *SEC v. Koracorp Industries, Inc.*, 575 F.2d 692, 698 (9th Cir.1978), *cert. denied*, 439 U.S. 953, 99 S.Ct. 348, 58 L.Ed.2d 343 (1979). His failure to express remorse at any time casts serious doubt on the sincerity of his assurances of future compliance. Belzberg's trial testimony and unrepentant demeanor stands in direct contrast to the defendant in *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8 (2d Cir.1977), who expressed immediate and vociferous remorse for his errors. *See also Chris–Craft Industries*, 480 F.2d at 388 (defendant's persistent contention that his past conduct was not improper weighs in favor of imposing an injunction).

Finally, defendants contend that attendant publicity, coupled with the costs of defending this litigation have caused severe harm and constitute ample deterrence against future violations. To accept defendants' reasoning, the propriety of injunctive relief would appear to hinge on wealth and standing. Determining relief on such factors alone is an anathema to our system of justice and must be rejected.[18]

## DISGORGEMENT

■ The Commission claims that defendants have profited from violations of section 13(d) by concealing their five percent position in Ashland and by continuing their purchases in a market where investors were wrongfully deprived of valuable information and thus could not value the stock accordingly. Defendants profited on the shares by approximately $2.7 million. The Commission requests the equitable remedy of disgorgement in addition to injunctive relief.[19]

Disgorgement as an equitable remedy is designed to compel defendants to "give up the amount by which [they] were unjustly enriched." *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir.1987). The principle is well established. More than 15 years ago the Second Circuit observed that the "deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." *SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1104 (2d Cir.1972). Judge John Pratt of this District Court declared "It has long been recognized that courts, pursuant to their general equity powers, may order ... disgorgement of monies or other benefits received, in SEC injunctive actions ... so as to prevent defendants from profiting from their illegal conduct." *SEC v. General Refractories Co.*, 400 F.Supp. 1248, 1260 (D.D.C.1975).

■ In this proceeding, defendants failed to file the Schedule D Statement by the March 14 deadline, and continued to acquire Ashland in a market where other participants were unaware of their five percent position and their future plans. Between March 14 and 25, defendants acquired 890,000 additional shares through Greenberg at a cumulative cost of $42.7 million. When defendants' position was finally made public on March 25, the market responded immediately. The price increased by 4¾ (nearly 10 percent) on the first trade of the day, increasing by another five percent over the next several days. When the Belzbergs' threatened takeover

---

**18.** Defendants' reliance on *SEC v. Scott,* 565 F.Supp. 1513, 1537 (S.D.N.Y.1983) *aff'd* 734 F.2d 118 (2d Cir.1984) for the proposition that publicity together with the cost attendant to the defense of the suit renders an injunction unnecessary is inappropriate. *Scott* concluded that an injunction was unwarranted only after entering an order of disgorgement of all profits flowing from the violation. It concluded that the disgorgement together with the other factors was sufficient to deter future violations.

**19.** Defendants suggest that the Court lacks authority to order disgorgement for a 13(d) violation merely because no court has ever before ordered disgorgement in such cases. Defend-

ants have offered no good reasons to treat 13(d) situations differently from other securities law violations. Since disgorgement is an equitable remedy, the Court has inherent power to order such relief barring an express statutory prohibition. *See Mills v. Electro Auto–Lite Co.,* 396 U.S. 375, 386, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970); *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946) ("unless a statute ... restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied"). There is nothing in the securities statute that would prohibit granting equitable relief of disgorgement in section 13(d) violations.

was rejected they resold their stock at a $15.5 million profit. That profit included the nearly $2.7 million, attributable to the 890,000 shares purchased in violation of section 13(d). The Commission requests that defendants disgorge the $2.7 million.

Although the parties agree that the Commission can only seek disgorgement of those profits which flowed from defendants' late filing of the Schedule 13D, they vigorously disagree over the method for determining the appropriate amount, specifically the degree of causation necessary between the violation and the resulting profit. Relying upon *SEC v. MacDonald*, 699 F.2d 47, 54 (1st Cir.1983), the Commission contends that the proper measure of disgorgement is the difference between what the defendants paid for the 890,000 Ashland shares acquired between March 14 through March 25 and what they were paid for those shares when they sold them back to Ashland on April 2. Defendants rely on the very same case to argue that the appropriate measure of disgorgement is the difference between First City's actual cost of acquiring Ashland stock and the costs that would have been borne if the purchases had been made in compliance with 13(d).

*MacDonald* supports the Commission's theory of disgorgement. While the case involved violations of Section 10(b) of the 1934 Act, the Court's analysis of disgorgement is relevant to all securities law violations. Relying on inside information, defendants bought stock in 1975 at four dollars per share. *Two years later*, they sold the stock at ten dollars per share. Concluding that the rise in the stocks' price over the course of the two years following the violation was not causally related to the inside information, the court required defendants to disgorge only those profits earned prior to the time such information was made public.

The court did not, however, require a showing that the profits earned while defendants were trading on their inside information were due to the possession of that information. Nor did it engage in any hypothetical inquiries as to what the price would have been if the violation had never occurred or what profits defendants could have earned if they had complied with the law. Rather it assumed that all profits obtained during the period when defendants were in violation of the law constituted "ill-gotten gains." Thus, in determining the disgorgement figure, the court subtracted the difference between the market price at the time the information was finally disseminated to the public from the price defendants paid for the shares during the period they possessed and traded on the inside information. Further, the court ruled that all doubts concerning the determination of disgorgement "are to be resolved against the defrauding party." *Id.* at 55.[20]

The Commission's request for disgorgement follows the very procedure for measuring disgorgement utilized in *MacDonald*. It seeks to disgorge only those profits made during the time First City violated the law and failed to file its 13D statement. During that time, defendants were effectively trading on insider material information—the knowledge that they owned more than five percent of Ashland shares and were contemplating mounting a takeover battle.

Defendants' theory for measuring disgorgement is based on an expansive, almost distorted reading of *MacDonald*. Relying on the testimony of their expert, Mr. Daniel Fischel[21], defendants attempt to determine what profits First City could have

---

**20.** The *MacDonald* court's theory of disgorgement is fully consistent with prior case law. The court cited several other cases where violators were required to disgorge those "profits accrued prior to the time the inside information was in general circulation among the investing public." *Id.* at 54. (citing *SEC v. Texas Gulf Sulphur Co.*, 312 F.Supp. 77 (S.D.N.Y.1970) *modified on other grounds* 446 F.2d 1301 (2d Cir.1971) *cert. denied*, 404 U.S. 1005, 92 S.Ct.

561, 30 L.Ed.2d 558 (1971); *SEC v. Shapiro*, 494 F.2d at 1309.

**21.** Mr. Fischel is Professor of Law and Business at the University of Chicago Law School and Director of the University's Law and Economics Program. He is also Executive Vice President of Lexecon Inc., a consulting firm.

obtained if it had filed a 13D statement on March 14.[22] This amount, defendants contend, should be subtracted from the profits actually obtained to arrive at a proper disgorgement figure. Neither *MacDonald* nor any other court has ever engaged in the type of hypothetical inquiry suggested by defendants. Ironically enough, in urging the Court to isolate the precise amount of profits that flowed from the violation, defendants must resort to and rely upon purely speculative hypothetical figures. Their novel proposal underscores a fact already noted by other courts—"there cannot be any perfect measure of damages." *See Elkind v. Liggett & Meyers, Inc.*, 635 F.2d 156, 172 (2d. Cir.1980). Yet faced with the inexact science of establishing causation, courts have explicitly refused to make it even more indeterminate by engaging in speculative inquiries as to what the price of stock would have been had the violations never occurred. *Id.* at 170–172 (rejecting expert testimony on the price at which the market would have valued the stock if there had been disclosure as hypothetical and "entirely speculative.")

■ Furthermore, by fixating on such a narrow theory of causation, defendants have lost sight of the purpose behind the disgorgement remedy. Disgorgement is an equitable remedy designed to maintain the integrity of the market and deter future illegal actions by making violations unprof-

itable. *See SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir.1985) (upholding trial court's order disgorging trading profits, subscription fees and profits from the shares sold two years after violation occurred); *SEC v. Tome*, 638 F.Supp. 596, 626 (S.D.N.Y. 1986), *aff'd* 833 F.2d 1086 (2d. Cir.1987) (disgorgement of all profits and dividends obtained from trading on inside information); J. Farrand, Ancillary Remedies in SEC Enforcement Suits, 89 Harv. L. Rev. 167–79 (1976). As Judge Timbers wrote in *Manor Nursing Centers*, "the deterrent effect of an SEC enforcement action would be greatly undermined if securities law violators were not required to disgorge illicit profits." 458 F.2d 1082, 1104 (2d Cir. 1972).[23]

The very purpose behind defendants understanding with Greenberg was to conceal their position in Ashland from the market place. By keeping its acquisitions secret, defendants were able to accumulate shares at artificially low prices. When they disclosed their holdings the price of stock escalated dramatically. The $51 price defendants received for their stock reflected the increase caused by the disclosure. The profits obtained from the buyback arrangement were attributable to the violation and must be disgorged.[24]

## CONCLUSION

At the conclusion of the trial, defendants' counsel likened the proceedings to the trial

---

**22.** Mr. Fischel advanced three distinct economic models of how the market might have reacted to the disclosure of First City's holdings on March 14th. Each of these models assumed events that never occurred and then speculated as to how the market would have reacted to the events. Alternative A, assumed that defendants would have purchased all 890,000 shares before March 14th and therefore would not have profited at all by their violation. Alternative B assumed that the price on March 14 was $52 the same as the price on March 25 warranting a disgorgement of $864,588. Alternative C assumed that defendants purchased the 330,700 shares on March 17 at the market price of $45.375 warranting a disgorgement of $496,050.

**23.** Because disgorgement is derived from a court's equitable powers, it is appropriate that courts take into account its policies and purposes when determining the proper amount. *See Fridrich v. Bradford,* 542 F.2d 307, 320, n. 26 (6th Cir.1976) *relying upon Blue Chip Stamps v.*

*Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975).

**24.** The amount of disgorgement is measured by the difference between the price defendants paid for the 890,100 shares of stock purchased between March 14 and 27 and the $51 per share payback they received from Ashland. Between March 17 to 25, Greenberg made the following purchases of Ashland for the defendants:

| Purchase date 1986 | Number of Ashland Shares | Strike Price | Total Cost to Defendants |
|---|---|---|---|
| March 20 | 205,500 | 46.02 | 9,457,110 |
| March 24 | 205,500 | 46.71 | 9,598,905 |
| March 25 | 377,900 | 48.29 | 18,248,791 |
| March 25 | 101,200 | 53.31 | 5,394,972 |
| | 890,100 | | $42,699,778 |
| Sale date | | | |
| April 2 | 890,100 | 51.00 | $45,395,100 |
| Profits subject to disgorgement | | | $ 2,695,322 |

(Px 88.)

scene in Lewis Carroll's Alice in Wonderland where the king found the knave guilty of writing a letter precisely because he didn't sign it. "You must have meant some mischief, or else you'd have signed your name like an honest man." However, a more appropriate analogy in children's literature is the death of the wicked witch in Frank Baum's Wizard of Oz. There, the relevant facts and circumstances demonstrated that the wicked witch had violated accepted mores and customs of the fictional culture. Thus, she deserved to be punished.

Similarly, the preponderance of both direct and circumstantial evidence surrounding the Ashland transaction demonstrate that defendants violated the securities laws promulgated by Congress. With an excess of boldness, they deliberately circumvented the section 13(d) filing requirements of the Exchange Act of 1934. They too must face the consequences.

Counsel for the Securities and Exchange Commission shall submit an Order consistent with this Memorandum Opinion within seven days.