ACCEPTED
12-14-00288-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
9/25/2015 5:04:34 PM
Pam Estes
CLERK

No. 12-14-00288-CV

*Oral Argument Requested*

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS

9/25/2015 5:04:34 PM

PAM ESTES
Clerk

# In the Twelfth Court of Appeals
# Tyler, Texas

## J. MARK SWINNEA
### *Appellant*

### v.

## ERI CONSULTING ENGINEERS, INC.
## AND LARRY SNODGRASS
### *Appellees*

*Appealed from the 114th Judicial District Court*
*Smith County, Texas*

## APPELLANT'S REPLY BRIEF

Michael E. Gazette
Texas Bar No. 07784500
Law Office of Michael E. Gazette
100 E. Ferguson, Suite 1000
Tyler, Texas 75702
Telephone: 903-596-9911
Facsimile: 903-596-9922
megazette@suddenlink.com

Greg Smith
Texas Bar No. 18600600
Nolan Smith
Texas Bar No. 24075632
RAMEY & FLOCK, P.C.
100 E. Ferguson, Suite 500
Tyler, Texas 75702
Telephone: 903-597-3301
Facsimile: 903-597-2413
gsmith@rameyflock.com
nolans@rameyflock.com

**ATTORNEYS FOR APPELLANT**

## CONTENTS

Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Reply Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     The Court should review the punitive disgorgement and punitive damages together, in one excessiveness analysis, and should reduce these awards according to statutory and constitutional limits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Because the actual damages do not flow from any cap-busting conduct, the statutory punitive-damage cap should apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.   Even considered incrementally, the punitive awards are excessive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     A.     The million-dollar punitive-damage award is excessive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     B.     The asset forfeiture in this case is per se a punitive damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     C.     The trial court's findings do not begin to support the near total asset forfeiture that has been awarded . . . . 13

     D.     The facts negate any notion that the current punitive awards are proper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     E.     The thought that Swinnea set out with actual malice, intending to harm ERI or Snodgrass is a tenuous notion under the record . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.   The excessiveness review should not involve prejudgment interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.   ERI's incessant references to the "unchallenged" nature of the trial-court findings does not mask or excuse the lack of an excessiveness analysis guided by actual conduct and circumstances as opposed to loaded and conclusory characterizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conclusion and Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# AUTHORITIES

## CASES:

*Alamo Nat. Bank v. Kraus*,
    616 S.W.2d 908 (Tex. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Allstate Ins. Co. v. Kelly*,
    680 S.W.2d 595 (Tex. App.-Tyler 1984, writ ref'd n.r.e.) . . . . . . . . 1, 2, 26

*In re Longview Energy Co.*,
    464 S.W.3d 353 (Tex. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 5

*International Bankers Life Ins. Co. v. Holloway*,
    368 S.W.2d 567 (Tex. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Pat Baker Co. v. Wilson*,
    971 S.W.2d 447 (Tex. 1998) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . 10

S.E.C. v. First City Fin'l Corp.,
    688 F.Supp. 705 (D.C. D.C. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*S.E.C. v. Jones*,
    476 F.Supp.2d 374 (S.D. N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*S.E.C. v. Manor Nursing Centers, Inc.*,
    458 F.2d 1082 ( 2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*S.E.C. v. Patel*,
    61 F.2d 137 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*S.E.C. v. Teo*,
    746 F.3d 90 (3d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*S.E.C. v. Todd*,
    2007 WL 1574756 (S.D. Cal. May 30, 2007) . . . . . . . . . . . . . . . . . . . . . . 4

*S.E.C. v. Tome*,
   833 F.2d 1086 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*,
   979 S.W.2d 730, 759 (Tex. App.–Houston [14th Dist.] 1998, no pet.) . . . .  26

*Snepp v. United States*,
   444 U.S. 507, 100 S. Ct. 763, 62 L. Ed. 2d 704 (1980) . . . . . . . . . . . . . . . .  11

*Swinnea v. ERI Consulting Engineers, Inc.*,
   364 S.W.3d 421 (Tex. App. –Tyler 2012) . . . . . . . . . . . . . . . . . . . . . . . . .  6, 7

**OTHER AUTHORITIES:**

Charles M. Hosch & Lauren T. Becker, *Business Torts*,
   64 SMU L. REV. 87 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

George P. Roach, *Texas Remedies in Equity for Breach of*
   *Fiduciary Duty: Disgorgement, Forfeiture, and Fracturing*,
   45 ST. MARY'S L. J. 367 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

George P. Roach, *Unjust Enrichment in Texas:*
   *Is it a Floor Wax or a Dessert Topping?*
   65 BAYLOR L. REV. 153 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT
   § 51 cmt. h (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

## The Reply Argument

The arguments in Swinnea's principal brief are stated as clearly as we are capable of. Swinnea stands on them and for the most part will not repeat them. All we ask the Court is to look past ERI's bullying tactics, to reach the merits. ERI simply has no merits explanation for why the sum of the disgorgement and punitive-damage awards should escape a due-process excessiveness review.

## I. The Court should review the punitive disgorgement and punitive damages together, in one excessiveness analysis, and should reduce these awards according to statutory and constitutional limits.

The asset forfeiture-disgorgement imposed on Swinnea is a punishment. While disgorgement that merely compensates a plaintiff or nullifies a defense windfall is remedial, any further disgorgement or forfeiture is a punishment. This principle was recently endorsed by the Texas Supreme Court, in *In re Longview Energy Company*, a mandamus proceeding in which the court was asked to review a supersedeas bond amount for excessiveness. 464 S.W.3d 353, 355 (Tex. 2015). The proceeding focused on Appellate Rule 24, governing supersedeas. *Id.* The question was whether to characterize the trial court's disgorgement of $95.5 million (the only present monetary recovery in the case[1]) as compensatory

---

[1] The trial court also awarded a constructive trust upon "future net production revenues." *Id.* at 356.

damages to be included in the supersedeas amount. *Id.* at 360.

According to the trial court's initial judgment (which was later amended to remove all discussion of how the court had calculated the amount of disgorgement), the $95.5 million was derived from past production revenues. *Id.* at 356. Specifically, that judgment explained the $95.5 million by taking the jury-found past production revenue ($120 million) then subtracting "the amount the jury found that the defendants paid to acquire [those assets, $24.5 million]." *Id.* at 355 (alteration in original). Consequently, the trial court's calculation omitted any credit for (1) the $127 million in jury-determined development costs expended to earn those production revenues or (2) other production expenses. *Id.* at 356. Based on this analysis, the supreme court concluded that the disgorged sum "may well be punitive," because it held the defendants liable "in excess of net gains" from their culpable conduct.

> The award may well be punitive. If we can believe the trial court's withdrawn characterization of the $95.5 million in its initial judgment, then Longview was awarded *gross* past production revenues less asset acquisition costs, all as found by the jury ($120 million - $24.5 million = $95.5 million), plus future production revenues net only of royalties and taxes, not all production-related expenses. **A judgment that makes the "defendant liable in excess of net gains [ ] results in a punitive sanction** that the law of restitution normally attempts to avoid." *Id.* at 360 (italics reflect emphasis by the court, bolding reflects our emphasis), quoting RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 51 cmt. h (2011).

This is exactly what Swinnea has been saying.

Disgorgement of revenues gained through the defendant's culpable conduct is nonetheless a "punitive sanction" whenever it exceeds the amount necessary to divest the defendant's *net* illicit profit from the transaction (*i.e.*, illicit benefits less costs incurred or consideration given in acquiring them). This bears repeating: just because an award disgorges revenues that the defendant gained via his culpable conduct, the disgorgement will be punitive, not remedial, to the extent it exceeds the *net* illicit profit to the defendant. The fact that none of the gross revenue stream would have been available to the defendants but for their culpable conduct is *not* a basis on which to declare a recovery of that revenue to be a compensatory or remedial recovery.

An unbroken line of securities cases illustrates the point. Because securities regulations confine the Securities Exchange Commission to relief that is "remedial relief and is not a penalty assessment,"[2] the federal circuit courts, in civil actions for securities infractions, have many times considered the difference between remedial disgorgement and punitive disgorgement. As these cases hold, disgorgement exceeding what is necessary to "make violations unprofitable" is a punitive recovery. *Manor Nursing Centers, Inc.*, 458 F.2d at 1104 (disgorging of

---

[2] *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1104 (2d Cir. 1972).

3

"profits and income earned on [securities] proceeds" was a prohibited penalty assessment and not a permitted remedial disgorgement); *see also SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) (remedial disgorgement limited to "the amount by which [the defendants] were unjustly enriched"); *SEC v. First City Fin'l Corp.*, 688 F. Supp. 705, 727 (D.C. D.C. 1988)(limiting profit disgorgement to only the portion of profit reasonably allocable to the defendant's violations); *accord SEC v. Patel*, 61 F.3d 137, 139-40 (2d Cir. 1995)(remedial disgorgement permitted under securities laws limited to a "reasonable approximation of profits causally connected to the violation"); *SEC v. Todd*, 2007 WL 1574756 at *18 (S.D. Cal. May 30, 2007) (SEC could not recover disgorgement because it failed to show that the amount it sought was a reasonable approximation of the defendant's ill-gotten gains); *SEC v. Jones*, 476 F. Supp.2d 374, 386 (S.D. N.Y. 2007)(remedial disgorgement was not recoverable because the SEC was "unable to set forth any evidence of specific profits" from the violations); *see SEC v. Teo,* 746 F.3d 90, 107 (3d Cir. 2014) (in determining limits of remedial disgorgement, court considers "whether particular profits are legally attributable to the wrongdoing, constituting unjust enrichment," or are more properly associated with other conduct).

Here, the trial court has awarded an asset forfeiture of nearly all Swinnea's

4

buyout consideration, Amended Add'l FOF 7-9, even though there is no proof that one cent of this was an illicit profit extracted in the buyout (such as might occur if a fiduciary breaches his duty in order to inflate the stock's purchase price above what its value would have been absent a breach). Indeed, there is no evidence that Swinnea profited from his breach of duty as to the buyout consideration: The reciprocal consideration that Swinnea exchanged (his honestly derived shares) was worth as much as what he received – and would have been worth the bargain even had Swinnea not participated in forming AQA. 4 RR 115 (ERI's accountant testified that Swinnea's share of the business had been worth the consideration paid in the buyout); 11/12/2013 RR at 73. Disgorgement in this situation is punitive.

Remedial disgorgement protects relationships and deters illegal activity "by making violations unprofitable." *First City Fin'l Corp.*, 688 F. Supp. at 728. Disgorgement going beyond the fiduciary's profit from his breach (*i.e.*, the bump in price realized as a result of the breach) is, as *Longview Energy* and the SEC cases illustrate, a "punitive sanction" subject to both statutory and constitutional restrictions on excessive punitive damages. To be clear: confiscation of the consideration ERI paid Swinnea for his ERI stock is not a *remedial* disgorgement.

So ERI is at a crossroads. If the disgorgement is intended to be remedial,

5

it must be limited to return of the profit from Swinnea's breach (the sales price less the stored value reflected in Swinnea's shares, honestly accrued over a decade). That incremental amount is zero. Any disgorgement in this case thus is punitive and must be subject to a constitutional excessiveness review.

ERI's position – that a *Kraus*-factor review of the million-dollar punitive-damage award should be close enough – simply can't be the answer.[3] The excessiveness review that is necessary *is a review of the combined total punishment – the disgorgement together with the explicit punitive-damage award.* This review cannot be piecemeal. Otherwise, any level of punishment could be justified by merely reviewing the awards in sufficiently small increments. It thus does ERI no good to tout this Court's prior *Kraus* analysis, which reviewed only the million-dollar award[4]: the moment the district court entered a disgorgement award that was not remedial but meted out a punishment, it ensured that there should be a

---

[3]Assuming the supreme court's decision in this case actually authorizes punitive disgorgement, there is nothing in that decision even hinting that the combined, total punishment would not be subjected to a constitutional excessiveness analysis. But that is the position ERI has backed into.

[4]This Court's *Kraus* analysis considered only the $1 million award. *Swinnea v. ERI Consulting Engineers, Inc.*, 364 S.W.3d 421, 424 (Tex. App. –Tyler 2012) ("[W]e conclude that exemplary damages in the amount of $1,000,000.00 is not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust."). The trial court, in contrast, has considered only the disgorgement/forfeiture (purporting to "review" its predecessor's long-since vacated disgorgement), and has declined to consider the punitive-damage award. *See* July 2014 Amended Judgment, p. 1 ("This Court reviewed the forfeiture award as instructed by the Court of Appeals.").

constitutional excessiveness review of the combined punitive damages and punitive disgorgement – all $1.72 million of it – at one time, measured relative to actual damages ($178,000). Further, the *Alamo* factors do not explicitly or even impliedly incorporate the ratio analysis that due process requires. *See Alamo Nat. Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). And no court has reviewed the entirety of the punishment that has been meted out – not under *Krause* or according to due-process principles for excessiveness.

To sustain the current judgment, ERI must provide a constitutionally satisfactory explanation why it is necessary to punish Swinnea at a level 10 times greater than actual damages, which is two-and-a-half times the presumptive constitutional maximum for even the worst cases when severe personal injury is threatened or a large segment of the public is endangered. ERI has never missed a beat on its way to record profits, and Snodgrass has obtained the entire company for what we now know is a bargain price.

What is worse, even in cases of strictly remedial disgorgement, it is clear that a court can't effectively review punitive damages for excessiveness without first knowing the nature and amount of all awards. *See International Bankers Life Insurance Company v. Holloway*, 368 S.W.2d 567, 584 (Tex. 1963) ("the remedy selected in relation to the actual harm done the plaintiff, together with the nature

7

of the acts of the defendants, are proper considerations in weighing the amount of an exemplary damages award against a complaint of excessiveness *and, indeed, may be such as not to justify an award of exemplary damages*."). Thus, it is always impermissible (procedurally *and* constitutionally) to assess the excessiveness of punitive damages in a partial vacuum, such as has occurred in this case. This is true whether one categorizes the disgorgement as punitive or remedial. And it is true notwithstanding that this case, regrettably, has lasted a decade. *Cf.* ERI Brief at 6 (accusing Swinnea of merely seeking to prolong the litigation). Even ERI, in the supreme court, was quick to concede that this Court's earlier excessiveness review – the same review ERI now endorses – "was premature," necessitating a new excessiveness review following the trial court's reassessment of the disgorgement remedy. As ERI confessed respecting this Court's 2012 excessiveness review,

> *Due process review of the punitive damage award was premature, because the trial court must first obey this Court's mandate to reevaluate the return-of-consideration damages. . . . After that review*, the trial court will no doubt follow this Court's instruction that a change in the underlying damage awards *requires* a new due process review. ERI Response to PFR at 3-4 (No. 12-0241 in the Texas Supreme Court) (emphasis ours).

As previously argued, this was an estoppel. *See* Swinnea Brief at 20. Now, ERI argues the opposite position. It does not deny its position in the supreme court

or dispute that position's effect upon the current appeal. It just ignores the matter.

At trial, even Snodgrass confessed that refunding the stock-purchase funds without deducting anything for the pre-buyout accrued value of Swinnea's shares would not be proper. 4 RR 189 ("I believe that I am owed that money back, yes, ma'am. Q: And then does the company come with it? A: No. But I'd be willing to split up the filing cabinets and some of the equipment, if he thought that was the way we had to go."). Likewise, the total forfeiture of Malmeba's rental income greatly exceeds Snodgrass's wildest dreams. 4 RR 193 (conceding that the rental recovery requested in a damage exhibit was incorrect and explaining: "What I should be asking for . . . is the difference between . . . what I had to pay [in rentals] and what the true value of the rent is.").

## II. Because the actual damages do not flow from any cap-busting conduct, the statutory punitive-damage cap should apply.

As a prelude to the new excessiveness review, this Court should revisit its prior refusal to apply the statutory punitive-damage cap, for reasons previously discussed and only mentioned briefly now. *First*, as ERI has not denied and thus impliedly concedes, the Court acted *sua sponte* in busting the statutory cap. Courts, however, generally should confine their decisions to ruling upon issues

raised by the parties. Swinnea Brief at 26, citing *Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998) (per curiam). *Second*, Swinnea had no notice in the trial court of any attempt at cap busting. The first time Swinnea knew that cap busting was in play was upon reading this Court's 2012 opinion, seven years post-trial. *Third*, respectfully, the criminal offense of securing documents by deception does not encompass the conduct in this case, where no one has switched documents or the like. And *finally*, while the Court has determined that Swinnea committed acts falling within a cap-busting exception for "securing execution of documents by deception," *Swinnea*, 364 S.W.3d at 424, the fact is that the punitive damages aren't associated with that conduct, but with the formation of AQA. The $178,000 in lost profits – the only damages and thus the only proper basis of the punitive damages – were sustained not because of any execution of documents but because AQA's formation impaired a relationship with an ERI customer (Merico). Amended Add'l FOF 6(a). The permissible amount of these unrelated punitive damages is not affected by the commission of unrelated conduct that has been the source of no compensatory award.

III. **Even considered incrementally, the punitive awards are excessive.**

A. **The million-dollar punitive-damage award is excessive.**

Respectfully, the million-dollar punitive-damage award is excessive by

itself, both statutorily and constitutionally. The only actual damages recovered – the $178,000 – is a recovery for the temporary loss of an ERI customer, Merico. *See* Amended Add'l FOF 6(a). This loss was not sustained in conjunction with the buyout. It resulted from formation of AQA (and, more directly, from Snodgrass's choice to allow AQA continued bidding access to ERI-administered asbestos-abatement projects in lieu of a Merico relationship, 5 RR 13-14). And because punitive damages cannot be recovered upon conduct that does not result in an underlying recovery of actual damages, it follows that the punitive damages redress the formation of AQA, not the act of securing documents by deception.

## B.    The asset forfeiture in this case is per se a punitive damage.

The asset forfeiture in this case begs for a constitutional due-process review, one integrated into a review of all punitive recoveries. Traditionally, disgorgement has been "tailored to deter" and confined to "reach[] only funds attributable to the breach," so as not to "saddle [the breaching fiduciary] with exemplary damages out of all proportion to his gain." *Snepp v. United States*, 444 U.S. 507, 515-16, 100 S. Ct. 763, 768-69, 62 L. Ed. 2d 704 (1980). Any greater recovery, namely the near total asset forfeiture awarded in this case, would be "intentionally punitive," "a form of specific restitution without counter-

11

restitution," and "a long step away from traditional remedies in equity . . . based on the unfounded assumption that forfeiture of assets is similar to forfeiture of revenues." George P. Roach, *Unjust Enrichment in Texas: Is It a Floor Wax or a Desert Topping?* 65 BAYLOR L. REV. 153, 248, 249-50 (2013). The two are different. *Id.* at 250.

Here, the "key fact" is that Swinnea did not gain his partnership interest in a non-consensual or unconscionable manner. *See id.* To afford the trial court's asset forfeiture without compensating Swinnea for the initial purchase of his shares (or their pre-buyout appreciation) would not only mete out a clearly punitive remedy, but would contradict "a long string of opinions in Texas and elsewhere that requires the principal to reimburse the fiduciary" for the value of any consideration he has parted with. *Id.* The asset-forfeiture remedy, while apparently now permissible, still should disgorge "only funds attributable to the breach," *id.*, or else it should be considered a *penalty* triggering all statutory and constitutional protections against excessive punishment. *See* George P. Roach, *Texas Remedies in Equity for Breach of Fiduciary Duty: Disgorgement, Forfeiture, and Fracturing*, 45 ST. MARY'S L. J. 367, 436 (2014); *see also* Charles M. Hosch & Lauren T. Becker, *Business Torts*, 64 SMU L. REV. 87, 107 (2011) ("[F]orfeiture unlinked to actual damages, for the purpose of 'preventing' – *i.e.*, deterring – such

abuses sounds very much like exemplary or punitive damages. . . . So, if forfeitures are to be extended beyond fees received, further equitable principles for when, how, and how much forfeiture is appropriate will likely need to be developed.").

### C. The trial court's findings do not begin to support the near total asset forfeiture that has been awarded.

ERI says the trial court's findings and conclusions support a full $720,000 disgorgement on top of the already burdensome punitive-damage recoveries. But these mostly conclusory assessments don't come close to a sufficient basis for such a clearly excessive, punitive forfeiture.

**Gravity and Timing.** In considering the "gravity and timing" of Swinnea's conduct, the trial court credits Swinnea with a "premeditated" purpose of violating the plaintiffs' trust (translated, he didn't disclose AQA's formation, ultimately leading to a temporary loss of one ERI customer). Amended Add'l FOF #1. Then, the court cites a "calculated course of conduct" and a "multifaceted plot," perhaps referencing the additional allegation (never proved in the evidence or expressly found by the trial court) that Swinnea didn't work the contractually required average of 36 weekly hours (a matter for which, in any event, no damage was ever found). *Id.* But beyond this, the trial court

leaves it to anyone's guess how the "gravity and timing" of Swinnea's conduct might merit a combined recovery exceeding 10.6 times the plaintiffs' actual damages. It doesn't.

**Level of Fault.** In considering the "level of intent or fault," the trial court has basically punted, stating only the conclusion that Swinnea acted with intent "to cause injury." Amended Add'l FOF 2. This conclusion in turn hangs on the slenderest of factual threads: Swinnea's alleged statement, made when Snodgrass was on the phone buying a luxury car, to the effect that *Snodgrass* – not Swinnea – was going to "run this company into the ground," after which Swinnea and the others would be free to buy ERI back for "pennies on the dollar." 3 RR 129; *see also* 4 RR 53-54. This may in some weak sense be relevant to motive, but it hardly proves a gotcha case of such malice as might support a massive, punitive asset forfeiture. Rather, the statement, presuming it was made, was an opinion addressing *Snodgrass's* business acumen.

Further, the trial court's conclusions about Swinnea's intent must be leavened by the facts that (1) Swinnea and his wife completely divested their ties with AQA within a few months after AQA's formation, 3 RR 6, 95, (2) AQA, as a contractor, operated a *complimentary* business to ERI's function as an engineering consulting firm, *e.g.*, 3 RR 26, 148, (3) as ERI's own vice president

14

agreed, the potential loss of Merico was never a threat to "the driving force of ERI for the future," 4 RR 20, rather, "having two companies . . . focused on taking care of our clients" would benefit ERI in the long run, *id.*, and (4) Swinnea actually won back Merico (the lone customer affected by AQA's formation) as an ERI customer, 5 RR 14, such that ERI indisputably now enjoys relationships with both companies. 5 RR 14; *accord* 5 RR 43.

The trial court appears to assume that a gateway finding of intentional breach magically justifies *any* level of punishment. That notion would render punitive damages limitless in virtually all cases where they can be awarded. And it would offer no clue as to why a whole-nine-yards asset forfeiture might be needed here, in the wake of the already robust punitive-damage recovery.

**Benefit to ERI and Snodgrass.** In purporting to consider the benefit to the plaintiffs, the trial court does just the opposite, ignoring the fact that the buyout made Snodgrass ERI's sole owner – just in time to see the company double its revenues and multiply its profitability. Amended Add'l FOF 3. The company's $800,000 profit in 2004 implies a benefit to Snodgrass of $400,000 from the buyout – in just that one year. 11/12/2013 RR at 73.

The ongoing ERI-AQA relationship has afforded ERI another tangible benefit, which the trial court also ignores. And, thanks directly to Swinnea's

15

efforts during the period in issue, 5 RR 14, Merico is again an ERI business associate. 5 RR 14, 43. While the trial record does not quantify this latter benefit, it is surely substantial. The evidence was that by the time of trial AQA was a "major contributor" to ERI's revenue, 3 RR 21, partnering with ERI on perhaps a quarter of ERI's projects (90% of AQA's work), 3 RR 144, both companies were "doing well" and their relationship was thriving. *E.g.*, 3 RR 143; 4 RR 30. Considering these benefits, it is safe to say that Snodgrass – now sole owner of a prosperous company with enhanced customer relationships – came out far better than Swinnea, and clearly better than if AQA had not been formed and the buyout had never closed. The trial court gives no basis for ignoring these substantial benefits, and there is no logical reason why they would not make the recovery of punitive damages and a punitive asset forfeiture all the less defensible.

**Centrality of Conduct.** The trial court says Swinnea directed his conduct "at the core elements of ERI." Amended Add'l FOF 4. But just how does the formation of a *complimentary* business with the mere temporary loss of one customer justify heaping a near total asset forfeiture on top of an already weighty punitive-damage award? The trial court doesn't say, and neither does ERI.

**Harm.** The trial court's consideration of the "threatened or actual harm,"

Amended Add'l FOF 5, fails miserably, mostly for reasons already discussed: The actual harm – a temporary loss of one client, which may have been fully neutralized before trial – is insufficient to sustain a million-dollars in punitive damages, let alone addition of another $720,000 in punitive disgorgement. Indeed, before this litigation, Snodgrass had never even thought to request his money back. 3 RR 46. Even ERI's Chris Power conceded that he had always thought AQA's formation would benefit ERI in the long run. 4 RR 20. And as stated, any notion that Swinnea angled for ERI's destruction hinges on the misreading of a singular opinion (made when Snodgrass was on the phone buying a luxury car) that Snodgrass was about to run the company in the ground.

**Adequacy of Other Remedies.** On this factor, the trial court offers nothing but a string of loaded adjectives, saying that lost profits and a punitive-damage recovery would somehow be "inadequate to remediate under the circumstances," branding Swinnea's conduct "willful, malicious," and "highly offensive," and deeming Swinnea's culpability sufficiently "significant" that "disgorgement of the ill-gotten profits and gains" was also required. Amended Add'l FOF 6. But there is absolutely no evidence that Swinnea accrued any such "profits or gains." Rather, he by all accounts gave up as much in consideration (shares of stock he had come by honestly) as he collected in the buyout. At

17

bottom, this finding is simply inexplicable, given that the actual damages fully compensate the loss, and the addition of another 5.6 times that amount as punitive damages surely is sufficient to "protect the trust relationship."

Beyond these conclusory "findings," the trial court simply stated that each of its three disgorgement awards[5] was "fair, equitable and just" under unspecified "facts and circumstances of this case." Amended Add'l FOFs 7, 8, and 9. Of course, the circumstances of the case include the existing assessment of a million dollars in punitive damages and the trial court's failure to find any actual damages beyond the brief loss of a single customer relationship – a loss that Snodgrass had his opportunities to avoid, that Swinnea worked to correct (by successfully re-establishing ERI's Merico customer relationship), and that stems from nothing more sinister than Swinnea's brief participation, right alongside ERI's current executive VP, in forming a complimentary business that since has bestowed ERI with a tangible boost to its sales volume.

The trial court's arbitrary findings lack any sign that the court (which did not preside over the trial) ever truly analyzed Swinnea's factual conduct or adequately considered the limited nature of the actual damages flowing from that

---

[5] $437,500 in buy-out cash, the entire $150,000 value of the transferred limited partnership interest [Malmeba], and all $133,200 in rentals for ERI's 3-year occupancy of Malmeba's facilities. Amended Add'l FOFs 7, 8, and 9.

conduct, let alone addressed the fact that ERI's subsequent prosperity appears to have actually been *aided* by the conduct. It is not enough to observe, in conclusory fashion, that Swinnea's conduct was intentional and constituted a breach of fiduciary duty, throw a few adjectives on the campfire, and then call it a day. Yet, that is a fair assessment of amended additional findings by which the trial court has analyzed the current disgorgement.

The trial court's hollow recitation of platitudes cannot be tolerated. Otherwise, constitutional due-process will become a toothless concept. If the court would have taken fair account of the total facts and circumstances, the excessiveness of the recoveries would have been glaringly obvious.

## D. The facts negate any notion that the current punitive awards are proper.

When considered in context of the material facts, the disgorgement or asset-forfeiture award and the million-dollar punitive-damage award mete out far more punishment than constitutional due process could ever allow. After all:

Swinnea came about his ERI interest honestly, having bought ERI together with Snodgrass in 1992. 2 RR 21. The buyout talks started when Swinnea approached Snodgrass about buying Snodgrass out. 2 RR 42. Snodgrass made a proposal. 2 RR 45-46. Swinnea countered with a proposal by which

19

Snodgrass would instead buy out Swinnea, on terms that were more favorable to Snodgrass.[6] Snodgrass accepted.

The resulting buyout agreement included an employment contract under which Swinnea agreed to work what would average to 36 hours per week during each three-month period. 2 RR 53; *see also* 3 RR 51. Extrapolating from his personal observation, Snodgrass surmised that Swinnea didn't meet the contractual minimum hours. 4 RR 173. But Snodgrass couldn't say for sure that Swinnea didn't satisfy this requirement. 4 RR 172. He knew Swinnea didn't work a full 36 hours *each and every* week. 4 RR 172. But the contract didn't require that. *Id.*

A month before the buyout closed, Swinnea and another ERI employee, Chris Power, helped their wives set up an abatement contracting business, AQA. 2 RR 63-66. ERI (a consulting engineering company) and AQA (an abatement contractor) were in "completely different," albeit complimentary, businesses. 3 RR 26, 148. At the time, Power had been preparing for the possibility of leaving ERI, to open a consulting business of his own, Power Environmental Consulting. 3 RR 38, 41, 109. If Power would have launched that business, it

---

[6]For instance, the proposal for a buy out of Swinnea's shares provided that ERI would pay building rentals at a "considerably" lower rate than what Snodgrass had requested in his proposal that Swinnea buy out Snodgrass's shares. 2 RR 49-51.

would have competed with ERI directly. But Power's involvement in a contracting business such as AQA could actually benefit ERI, the predominant consulting company in the area, at least in the longer term. 3 RR 41; 5 RR 140, 148. As it unquestionably did. *See* 5 RR 101 (At trial, Snodgrass said he *wanted* to see AQA prosper, because it was a way of rewarding Power for his work for ERI); *see also* 5 RR 140.

Ms. Power and Ms. Swinnea were AQA's officers and AQA employees, while Swinnea and Power served as AQA directors. 2 RR 63-66. Neither Swinnea nor Power told Snodgrass about their involvement with this new company. Swinnea at trial regretted not having disclosed the AQA relationship. 2 RR 83, 149.

Within a few months after AQA's formation, Snodgrass learned of Swinnea and Power's involvement in AQA, and he, too, was disappointed. 3 RR 46. But he never discussed getting his money back. 3 RR 46.

Merico, AQA's chief competitor in asbestos remediation, "didn't have a problem with AQA as long as they weren't competing against [Merico] for work in the asbestos [business] and wouldn't be bidding on [asbestos] projects through ERI." 5 RR 12. Snodgrass, however, refused to put any limit on ERI's budding relationship with AQA. 5 RR 13. So for that reason Merico ceased

21

dealings with ERI. 5 RR 13.

For at least a year, Merico didn't bid on any of ERI's projects and didn't invite ERI to any of Merico projects. 5 RR 14. When Merico did this, it freed ERI's personnel to refocus their efforts on other, more profitable work. 3 RR 70. (Merico performed asbestos remediation, which to a consultant like ERI represented a "low profit," cyclical business that by Snodgrass's admission ERI was trying to "diversify away from," 4 RR 123, whereas mold remediation work, which Merico didn't undertake, was high profit. 3 RR 70.)

After a year or so, *Swinnea*, on ERI's behalf, started inviting Merico to once again bid ERI projects. 5 RR 14. As a result of Swinnea's action, Merico in the months before trial had been "bidding on quite a bit of ERI's projects again." 5 RR 14; *accord* 5 RR 43. Merico's principals refused Snodgrass's requests that they write a letter stating that the start up of AQA was the reason Merico temporarily quit doing business with ERI. As they told Snodgrass, "we felt like that we gave Larry the opportunity to have kept our relationship going if he would not have let AQA bid on ERI's asbestos projects" and, thus, they didn't think the letter Snodgrass requested would have been truthful. 5 RR 15-16.

A few months after starting AQA, the Swinneas left it, selling out to Tracy Power.

22

As of trial, Chris Power remained ERI's executive vice president, 3 RR 123, while his wife owned and operated AQA. The companies thus continued in a close relationship, with the great majority of AQA's business coming from ERI administered projects. 3 RR 49. When asked whether he would have given up AQA if it was hurting ERI, Power – ERI's employee and witness – explained that "having two companies that were focused on taking care of our clients would, in the long-term – the loss of Merico was – was not going to be the driving force of ERI for the future." 4 RR 20. This was a reference partly to the fact that Merico's business niche (asbestos abatement) was a slowly dying industry, a matter that Merico's own principals confirmed. 5 RR 9.

In contrast to Merico's declining asbestos work, ERI' s and AQA's post-buyout prospects were bright. AQA was "doing well." 3 RR 143. So was ERI. 4 RR 178. During the post-buyout period, as Snodgrass conceded, ERI was flush with revenues from a "huge" project. 4 RR 178. While Snodgrass in hindsight thought Swinnea had tried to "be an anchor to drag [ERI] down," he also conceded that ERI had done well. 4 RR 182; 4 RR 201 ("Every year since Mark and I owned the company, we have broke [sic] records."). And so it had. The company's declared annual profit in 2004 (the year before trial) exceeded $800,000, not much less than double the cash consideration Snodgrass paid in

23

the buyout.

Accordingly, ERI's own CPA of 10 years, Keith Steiffel, agreed the price paid in the buyout was "a good price." 4 RR 115. Snodgrass, too, agreed that at the time of trial, even in the midst of a down year revenue-wise, the company still was worth what was paid, and Snodgrass was not in any mood to sell it. 4 RR 161-62, 190. And Swinnea's accounting expert confirmed that the company's post-buyout revenue streams suggested a steady progression of values for Swinnea's half interest in the company:

- $613,000 to $800,000 as of the August 2001 buyout,

- $979,000 at the end of 2002, and

- $1,467,000 by the end of 2004. 11/12/2013 RR at 73.

Just for Swinnea's former half interest.

**In summary:** Swinnea helped to start (and for a brief six months supported his wife in co-managing) the environmental abatement contractor AQA. He didn't tell ERI or Snodgrass at the time, and in this may have breached a fiduciary duty. But as Swinnea has argued elsewhere, AQA, being a contractor, was in a complimentary business to ERI (which is an environmental consultant). ERI has many customers throughout the state. AQA's formation caused loss of exactly one of them (Merico). Before that loss ever occurred, ERI

24

was offered the undisputed opportunity to entirely avert the loss. (Merico told ERI that the companies could continue their business relationship if ERI agreed AQA would not be invited to bid for ERI-supervised projects. 5 RR 12-16.) ERI and AQA developed a prosperous relationship of their own, which necessarily offset the loss of Merico in whole or part, yet the damage award ignores this crucial fact.

E. **The thought that Swinnea set out with actual malice, intending to harm ERI or Snodgrass is a tenuous notion under the record.**

ERI makes much of a determination that Swinnea meant ERI harm. The determination hinges on a the fact, already mentioned, that Swinnea is purported to have told Power and another ERI employee to "be patient because we can buy this company back 50 cents on the dollar. . . . Larry's going to run it into the ground." 3 RR 129; *see also* 4 RR 53-54 ("If y'all will just kind of hang in there, . . . Larry is basically probably going to run this thing into the ground, and we can probably buy this thing back on [sic] pennies on the dollar"). Viewed reasonably, this statement is a comment on Snodgrass's business abilities and a prediction of what he would do when running the company by himself. Swinnea's prediction surely also referenced the fact that before the buyout, Snodgrass had not put nearly as many hours into the business as Swinnea had.

25

(By Snodgrass's own account, Swinnea averaged 55 to 60 hour weeks, year after year, while Snodgrass typically worked a standard 40 hour week. 4 RR 163.)

In any event, the company has prospered.

## IV. The excessiveness review should not involve prejudgment interest.

ERI's notion that prejudgment interest can be used to inflate the actual-damage side of the excessiveness comparison is wrong. (ERI is also wrong to presume "prejudgment interest of $267,000." ERI Brief at 27. The trial court's judgment explicitly awards $88,370.82 in prejudgment interest and not a penny more. 2014 Amended Judgment, p. 3.) This Court's decision in *Allstate Insurance v. Kelly* settled the matter, holding that prejudgment interest is not a part of actual damages. *Allstate Ins. Co. v. Kelly*, 680 S.W.2d 595, 611 (Tex. App.–Tyler 1984, writ ref'd n.r.e.) (DTPA trebling would be capped at three times actual-damage award, excluding prejudgment interest, because prejudgment interest is not a component of actual damages). Other cases directly hold that prejudgment interest is not to be considered in evaluating punitive damages for excessiveness. *See, e.g., Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 759 (Tex. App.–Houston [14th Dist.] 1998, no pet.). Thus, a proper ratio analysis reveals that the million-dollar punitive-damage award of itself already reflects a huge 5.6 to 1 ratio of actual to punitive damages. On adding the $720,000 in punitive

asset forfeiture, the ratio balloons to nearly 10 to 1. It bears repeating, the ratio of actual damages to the combined punishments is 10 to 1. There is no reason why this combined sum should get a free pass from constitutional scrutiny.

## V. ERI's incessant references to the "unchallenged" nature of the trial-court findings does not mask or excuse the lack of an excessiveness analysis guided by the actual conduct and circumstances as opposed to loaded and conclusory characterizations.

Throughout appeal, ERI has seized every opportunity to say that the trial court's findings are "unchallenged." By this, ERI means the appeal did not raise a factual-sufficiency attack. That, of course, admits only that the evidence was conflicting. It does not concede ERI's sweeping characterizations. Nor does it concede ERI's premise, which appears to be that no punishment can be too large in this situation. And it also doesn't concede that the punishment's excessiveness can be determined without considering Swinnea's actual conduct and its real-life factual context. But that is exactly what ERI attempts in this case. ERI and the trial court say no more than that Swinnea has intentionally breached fiduciary duties and, thus, the punishment dispensed – nearly 10 times actual damages – must be okay. Due process and excessiveness reviews don't work that way. Rather, the awards must be considered in light of the facts and not just their broad legal characterizations.

27

## Conclusion and Prayer

Do not be distracted or deterred by ERI's bullying tactics. It is fundamental to our justice system that every defendant have the law correctly applied to his case, regardless how the defendant and his conduct are portrayed.

The Court should reverse the prior disgorgement and punitive-damage awards. It should undertake a full excessiveness review, to ensure compliance with statutory as well as constitutional maxima. And it should cap the sum of all such recoveries – whether denominated as punitive damages or as disgorgement/forfeiture – at $357,202.10 (*i.e.*, an amount equaling two times recoverable actual-damages).[7] Of course, Swinnea also prays for all other relief that this appeal may authorize.

---

[7]In any event, the Court should reject ERI's invitation to use the disgorgement to leverage a higher punitive-damage ceiling. Here, where the disgorgement indisputably does not reflect an additional ERI injury, it makes no sense that the disgorgement would be lumped with actual damages in evaluating the ratio of punishment to damages.

Respectfully submitted,

<u>   /s/ Greg Smith      </u>
Greg Smith
State Bar No. 18600600
Nolan Smith
Texas Bar No. 24075632
RAMEY & FLOCK, P.C.
100 East Ferguson, Suite 500
Tyler, TX  75702
Telephone: (903) 597-3301
Facsimile:   (903) 597-2413
gsmith@rameyflock.com
nolans@rameyflock.com

Michael E. Gazette
Law Office of Michael E. Gazette
100 East Ferguson, Suite 1000
Tyler, TX  75702
Telephone: (903) 596-9911
Facsimile:   (903) 596-9922
megazette@suddenlink.com

**COUNSEL FOR APPELLANT,
J. MARK SWINNEA**

## Certificate of Service

The undersigned certifies that a copy of the above and foregoing document was served upon counsel for Appellees in accordance with the applicable Texas Rules of Civil Procedure on this the 25ᵗʰ day of September, 2015, on the following:

**Via email [drace@icklaw.com](mailto:drace@icklaw.com)**
Deborah Race
Ireland, Carroll & Kelley, P.C.
6101 S. Broadway, Suite 500
Tyler, TX  75703

**Via email [mahatchell@lockelord.com](mailto:mahatchell@lockelord.com)**
Mike A. Hatchell
Locke Lord, LLP
100 Congress Avenue, Suite 300
Austin, TX  78701

**Via email [randerson@gillenanderson.com](mailto:randerson@gillenanderson.com)**
Roger W. Anderson
Gillen & Anderson
613 Shelley Park Plaza
Tyler, TX  75701


　　　　　　　　　　　　　　　 /s/ Greg Smith
　　　　　　　　　　　　　　 Greg Smith

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of TEX. R. APP. P. 9.4 because it contains 6,411 words, excluding the parts of the brief exempted by TEX. R. APP. P. 9.4(i)(2)(B).

2.      This brief complies with the typeface requirements of TEX. R. APP. P. 9.4(e) because it has been prepared in the proportionally spaced typeface using Word Perfect X5 in 14 point Garamond font.

Dated: September 25, 2015.

    /s/ Greg Smith
Greg Smith